[No. B182892. Second Dist., Div. Four. Aug. 29, 2006.]

CAZA DRILLING (CALIFORNIA), INC., Plaintiff, Cross-defendant and Respondent, v.
TEG OIL & GAS U.S.A., INC., Defendant, Cross-complainant and Appellant;
SEFTON RESOURCES, INC., Cross-complainant and Appellant.

454

**COUNSEL**

Ford, Walker, Haggerty & Behar and K. Michele Williams for Defendant, Cross-complainant and Appellant and for Cross-complainant and Appellant.

Clifford & Brown, Grover H. Waldon and Daniel T. Clifford for Plaintiff, Cross-defendant and Respondent.

## OPINION

**EPSTEIN, P. J.**—Appellants TEG Oil & Gas U.S.A., Inc. (TEG), and its parent company Sefton Resources, Inc. (Sefton), appeal the grant of summary judgment on their cross-complaint against respondent CAZA Drilling (California), Inc. (CAZA). TEG hired CAZA pursuant to a written agreement to drill a well on an oil field leased by TEG and Sefton and operated by TEG. CAZA argued, and the trial court agreed, that exculpatory and limitation of liability provisions in the parties' agreement precluded the recovery of the types of damages sought in the cross-complaint: compensation for economic loss and physical harm to equipment and facilities. The court entered judgment on the cross-complaint, despite appellants' contention that CAZA was both negligent and in violation of various regulations governing oil drilling operations.

On appeal, appellants take the position that the exculpatory and limitation of liability provisions in the parties' agreement are invalid under Civil Code section 1668 (section 1668), which prohibits enforcement of contracts that have for their object the exemption of parties from responsibility for fraud, willful injury, or violations of law. We conclude that the contractual provisions represented a valid limitation on liability rather than a complete exemption from responsibility, and that, in any event, appellants have failed in their repeated efforts to identify a specific law or regulation potentially violated by CAZA. We shall affirm the trial court judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Certain background facts are not disputed. In 2002, CAZA was hired by TEG to drill a well at the Tapia oil field, located in Castaic, California. The well was referred to as "Yule 6." The work was performed under a standardized contract entitled "Daywork Drilling Contract—U.S."[1] A few days after drilling began, there was a blowout, resulting in the death of a CAZA employee, injury to others, and complete destruction of Yule 6.

It is appellants' position the blowout was the result of the negligence of CAZA's crew in pulling the drillstring out of the wellhole too quickly (referred to as "swabbing in"), which caused a fire to ignite. Under appellants' theory, the crew committed further negligence by failing to close the blowout preventer after the fire began. Nonetheless, TEG felt constrained to engage CAZA to do additional work to help repair the damage. In 2003, the parties signed a second Daywork Drilling Contract and a "Payment Schedule" to deal with outstanding invoices due under the 2002 agreement.

---

[1] The same document also contained the "Drilling Bid Proposal" from CAZA.

*Complaint*

In November 2003, CAZA sued TEG for breach of contract, open book account, account stated, quantum meruit, and foreclosure of oil and gas liens. Initially, the complaint was based on the Payment Schedule. CAZA claimed to be owed $33,219.94, plus interest.

Subsequently, CAZA amended the complaint to include claims for breach of the two Daywork Drilling Contracts. The claim for unpaid work was increased to $117,824.73, based on work performed under the 2003 agreement.

*Cross-complaint*

TEG and Sefton cross-claimed against CAZA for breach of contract, negligence, and negligence per se based on violations of various safety provisions contained in state and federal regulations. The cross-complaint alleged that as a result of CAZA's actions appellants suffered "damage to the Well and the hole, as well as unexpected and otherwise unnecessary cleanup and remediation damage, and losses to [appellants'] business operations." Although there is a reference to the related lawsuit by the survivors of the deceased worker (*Currington et al., v. TEG Oil & Gas U.S.A. et al.* (Super. Ct. L.A. County, 2003, No. PC033424 (*Currington*)), the cross-complaint does not seek indemnification for damages paid to the plaintiffs in that lawsuit.

*Daywork Drilling Contract*

The 2002 Daywork Drilling Contract consists of a standardized form agreement with a number of blanks for the name of the operator, the contractor, the location of the well, the commencement date of drilling operations, the rates to be charged for various tasks, and other items. TEG was designated the "Operator" and CAZA was described as the "Contractor." The contract begins with a statement that "Operator [TEG] engages Contractor [CAZA] as an Independent Contractor to drill the hereinafter designated well or wells in search of oil or gas on a daywork basis" and that "Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator." "Daywork basis" is defined to mean that "Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations)." The contract also provides that: "When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein.

Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis, including results and all other risks or liabilities incurred in or incident to such operations."

Paragraph 8, entitled "DRILLING METHODS AND PRACTICES" includes the following pertinent subparagraphs: "8.1 Contractor [CAZA] shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole. [¶] . . . [¶] 8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract."

Paragraph 14 governs "RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK." Under subparagraph 14.1, the contractor (CAZA) "assume[s] liability" for "damage to or destruction of Contractor's surface equipment," unless the damage fell under paragraph 10, which requires the operator (TEG) to prepare a "sound location" to support the drilling rig, or subparagraph 14.3, which requires the operator to assume liability for damage to or destruction of the contractor's equipment "caused by exposure to highly corrosive or otherwise destructive elements, including those introduced into the drilling fluid." Subparagraph 14.2 requires the operator to assume liability for "damage to or destruction of Contractor's in-hole equipment."

Subparagraph 14.4 requires the operator (TEG) to assume liability "for damage to or destruction of Operator's equipment . . . regardless of when or how such damage or destruction occurs," and to "release Contractor of any liability for any such loss or damage." Similarly, under subparagraph 14.5, the operator is to "be solely responsible for . . . damage to or loss of the hole, including the casing therein" and the operator is to "release Contractor [CAZA] of any liability for damage to or loss of the hole" and in addition "protect, defend and indemnify Contractor from and against any and all claims, liability, and expense relating to such damage to or loss of the hole."

In subparagraph 14.6, the operator releases the contractor from liability for, and agrees to indemnify the contractor from and against claims "on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water" unless "reduced to physical possession above the surface of the earth," and for "any loss or damage to any formation, strata, or reservoir beneath the surface of the earth."

Subparagraphs 14.8 and 14.9 require the parties to indemnify each other for claims based on injuries to their own employees "without regard to the cause or causes thereof or the negligence of any party or parties."

Subparagraph 14.10 states that the operator is liable "for the cost of regaining control of any wild well, as well as for cost of removal of any debris."

The parties focus particular attention on subparagraph 14.11. Entitled "Pollution and Contamination," it provides:

"Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12[2], it is understood and agreed by and between Contractor and Operator that the responsibility for pollution and contamination shall be as follows: [¶] (a) Unless otherwise provided herein, Contractor [CAZA] shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnity Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

"(b) Operator [TEG] shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage of any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor of any liability for the foregoing."

Subparagraph 14.12 provides that neither party is liable to the other for "special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit or business interruptions including loss or delay of production, however same may be caused."

---

[2] As we have seen, paragraph 10 obligates the operator to prepare a sound location. Paragraph 12 provides for termination of the contractor's liability after restoration of the location.

Finally, subparagraph 14.13 entitled "Indemnity Obligation" provides: "Except as otherwise expressly limited herein, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof (including preexisting conditions), strict liability, regulatory or statutory liability, breach of warranty (express or implied), any theory of tort, breach of contract or the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive."

There are two nonstandardized provisions. A handwritten term provides for a $10 million umbrella policy, in addition to the statutory workers' compensation insurance and the comprehensive general and automobile liability insurance policies. The other change is the deletion by interlineation of a provision requiring TEG to pay motel expenses for CAZA employees.

### CAZA's Motion for Summary Judgment

CAZA moved for summary judgment on the cross-complaint on the ground that the 2002 Daywork Drilling Contract allocates liability for all damages claimed by appellants in the cross-complaint to TEG. The statement of undisputed material facts (SOF) is quite brief. With respect to the 2002 Daywork Drilling Contract, it states that the parties entered into the contract on November 7, 2002, that the contract identified TEG as operator and CAZA as contractor, and that TEG "claims that it is owed money for losses that resulted from the performance of the day work contract."

Other factual allegations were geared toward establishing that the parties' agreement contract was not an adhesion contract. In this regard, the SOF states that TEG had discussions with seven other drilling companies before settling on CAZA because CAZA "had the only drilling rig available in the area" at the time, although TEG "could have waited until a rig owned by [three other companies] became available"; that TEG's agent, Karl F. Arleth, refused to sign the 2002 contract until TEG was named an additional insured under CAZA's umbrella policy; that "[Arleth] struck out a term of the day work contract that would have required [TEG] to compensate CAZA" for its employees' hotel expenses; and that "[a]ll terms of the day work contract are negotiable for a price."

The remaining factual allegations relate to establishing that appellants were not at a disadvantage in negotiating with CAZA and were equally knowledgeable concerning the vagaries of drilling for oil. In this regard, the SOF states that Sefton had a market capitalization between $3 and $4 million; that its chief executive officer, Jim Ellerton, was "well versed in the formation of oil

and gas exploration companies"; that Arleth "held various positions in the oil and gas industry" since obtaining his degree; that Arleth worked for 22 years with "the international oil and gas conglomerate Amaco"; that Arleth's position with Amaco included "exploration geologist" and "president of Amaco Polant, Limited"; that "[d]rilling a commercial oil well is an extremely costly process that can result in the expenditure of hundreds of thousands of dollars"; and that "Craig Krummerich, the drilling engineer hired by [TEG], was hired for the express purpose of executing the 'drilling program with the drilling company, CAZA.' "

In a separate declaration, Gene Gaz, area manager for CAZA, explained that there are many different contracts covering drilling services. Besides the standard "Daywork Drilling" contract there are standard "Turnkey" contracts and "Footage" contracts, and operators sometimes prepare their own agreements. Under a Turnkey contract, the contractor hires a geologist and formulates a drilling plan, but under a Daywork Drilling contract, "the Operator is in control" and "[t]he Contractor receives all of its direction from the Operator." Gaz stated that standard provisions are negotiable and that if a company wished to place responsibility for damage caused to the geologic structure on CAZA, "CAZA [would] allow such a change in exchange for a dramatically increased drilling cost to the Operator."[3]

In its memorandum of points and authorities, CAZA relied primarily on the 2002 Daywork Drilling Contract provision that "Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork basis, including results and all other risks or liabilities incurred in or incident to such operations" to establish that it could not be liable to appellants on the cross-complaint. The memorandum also references subparagraph 14.11 governing liability for environmental pollution, subparagraph 14.5 governing liability for damage to the hole, and subparagraph 14.12 prohibiting the recovery of consequential damages.

*Appellants' Opposition*

In their opposition SOF, appellants disputed that the provisions of the Daywork Drilling Contract were negotiable. Karl Arleth, TEG's former president and a director of Sefton who signed the contract on behalf of TEG, stated in a declaration that he was "never informed by CAZA that any of the provisions in the standard, pre-printed form were negotiable," and that "under the circumstances (the small size of our company and the unavailability of other drilling rigs and CAZA's awareness of these facts), it was clear to me

---

[3] Under the 2002 Daywork Drilling Contract, CAZA charged approximately $7,780 per day plus approximately $6,000 for mobilization and demobilization costs.

that they were not negotiable." He also stated, however, that "we agreed with a hand-written change that CAZA would provide a $10 million umbrella policy and we also agree[d] to eliminate what appeared to be virtually duplicate per diem reimbursements by deleting the motel expense line and leaving the daily subsistence amount."

With respect to their losses, appellants stated that "Cross-Complainant[4] claims that it is owed money for damages to its well and other costs and expenses resulting from CAZA's breach of the contract and from CAZA's gross negligence and violation of law." They further stated that "[t]he blowout and fire at the Yule 6 well caused injury and death and completely destroyed the well, forcing [appellants] to expend funds for remediation and clean-up, and for other costs and expenses, leaving TEG without income and resulting in Sefton having to sell its stock at a depressed price to raise capital."

Appellants disputed that any of their employees was expert in drilling. They asserted that CAZA "had the only drilling rig available for work which would allow TEG to begin drilling work during the latter part of 2002" and that "[f]or financial reasons and because of duties to stockholders, [appellants] could not wait for other companies to have a rig available at a later time."

The remainder of appellants' SOF describes in detail the actions or omissions of CAZA's crew that appellants believe caused the blowout and fire. These assertions were supported by the declaration of expert witness, Gregg S. Perkin. Perkin expressed the opinion that "the CAZA crew swabbed in TEG's well as the drill stem was being pulled from the well"; that "the swabbing of the Yule 6 wellbore by the actions of the CAZA crew, and not an earlier reduction in the drilling mud's weight, caused the well to kick" resulting in "the well's blowing out and catching fire"; and that "[m]ore likely than not . . . the drill stem was being pulled out of the hole [in a] negligent manner." He based this opinion on his review of the report of the Department of Gas and Geothermal Resources, the "DataHub EDR Log," and CAZA's "Master Driller Reference Guide." Perkin stated that in undertaking these actions, CAZA violated "Part 30 of the Code of Federal Regulations, Part 250.410(b), which stated that: [¶] '4) Drill pipe and downhole tool running and pulling speeds shall be at controlled rates so as not to induce an influx of formation fluids from the effects of swabbing nor cause a loss of drilling fluid and corresponding hydrostatic pressure decrease from the effects of surging. [¶] 5) When there is an indication of swabbing or influx of

---

[4] Since appellants' SOF used the term "Cross-Complainant" in the singular, it is unclear whether TEG or Sefton is being referred to or if it was a typographical error and both parties claim to have suffered such damages.

formation fluids, the safety devices and measures necessary to control the well shall be employed. The mud shall be circulated and conditioned, on or near the bottom, unless well or mud conditions prevent running the drill pipe back to the bottom.' " (Boldface omitted.)

### Trial Court Order

The trial court granted the motion for summary judgment on the cross-complaint, stating in its order: "[CAZA] asserts that the cross-complaint is barred by the provisions of the contract between the parties assigning liability 'for all consequences of operations by both parties' to [TEG]. Therefore, the issue is one of contract interpretation and is a matter of law for the court to decide. [¶] [TEG] points to clauses in the contract requiring [CAZA] to maintain and control well equipment and follow the law. These provisions, however, do not negate the provisions assigning liability to [TEG] 'for all consequences of operation.' [TEG] argues further that the exculpatory provisions of the contract are void as against public policy under Civil Code Section 1668. The court disagrees for the reasons set forth in the moving papers."

Judgment was entered on the cross-complaint, and both Sefton and TEG purported to appeal, although TEG was a party to the still pending complaint.

## DISCUSSION

### I

Where a defendant cross-claims against the plaintiff, dismissal of the cross-complaint is not a final judgment for purposes of appeal unless there is a separate and distinct party involved and adjudication of the cross-complaint represents a final adverse adjudication as to that party. (See, e.g., *Kantor v. Housing Authority* (1992) 8 Cal.App.4th 424, 429 [10 Cal.Rptr.2d 695]; *County of Los Angeles v. Guerrero* (1989) 209 Cal.App.3d 1149, 1152, fn. 2 [257 Cal.Rptr. 787]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 73, p. 128.) Because TEG is still involved in litigation with CAZA, we asked the parties to explain how it could be a proper party to this appeal. We also asked them to address Sefton's standing to assert any issues pertaining to the 2002 Daywork Drilling Contract and damage to the oil facilities. The cross-complaint alleged that Sefton was a third party beneficiary of the agreement, but the sole basis for that contention appeared to be its status as TEG's parent. No facts were alleged to show an intent by the parties to confer any benefit on Sefton, other than the indirect benefit derived from profits earned by its subsidiary TEG. (See *Berclain America Latina v. Baan Co.* (1999) 74

Cal.App.4th 401, 405 [87 Cal.Rptr.2d 745] ["It is elementary that a party asserting a claim must have standing to do so. In asserting a claim based upon a contract, this generally requires the party to be a signatory to the contract, or to be an intended third party beneficiary"]; *Luis v. Orcutt Town Water Co.* (1962) 204 Cal.App.2d 433, 441–442 [22 Cal.Rptr. 389] [holding that to assert a claim as a third party beneficiary, "a plaintiff must plead a contract which was made expressly for his benefit and one in which it clearly appears that he was a beneficiary . . . . The fortuitous fact that he may have suffered detriment by reason of the nonperformance of the contract does not give him a cause of action" (citation omitted)]; *National Rural Telecommunications v. DirecTV* (C.D.Cal. 2004) 319 F.Supp.2d 1040, 1057 ["In general, a parent corporation and its subsidiary are legally distinct entities, and a contract under the corporate name of one is not treated as that of both"].)

In a supplemental brief, appellants explain that CAZA raised the issue of Sefton's standing in a demurrer to the cross-complaint that preceded the summary judgment motion. The trial court overruled the demurrer. Accordingly, appellants had no occasion to amend the cross-complaint. In their supplemental brief, appellants contend that Sefton owned the oil field where the injury occurred and the mineral rights impacted by the drilling accident. Since the order overruling the demurrer is not before us, we express no opinion on whether it was properly decided. But we agree with appellants that, under the circumstances, it would be unfair for this court to assume that appellants could not have amended the cross-complaint to assert direct injury to Sefton had the trial court required that they do so.

We turn to the issue of whether TEG is a proper party to this appeal. Where the issues involved in an appeal are "inextricably intertwined" with claims raised by a party still involved in litigation at the trial court level, "judicial economy" permits that party to join in the appeal. (*Miller v. Silver* (1986) 181 Cal.App.3d 652, 658 [226 Cal.Rptr. 479]; accord, *Bob Baker Enterprises, Inc. v. Chrysler Corp.* (1994) 30 Cal.App.4th 678, 684–685 [36 Cal.Rptr.2d 12]; see *California Dental Assn. v. California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 60 [271 Cal.Rptr. 410] [where order sustaining demurrer was final and appealable with respect to some of the named defendants, court treated appeal from that order as it related to other defendants as a writ petition]; *G. E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 325 [13 Cal.Rptr.2d 803] [same, except that appeal was taken from an order granting summary judgment].) That describes this case. We conclude, therefore, that TEG is a proper party here.

## II

We now turn to the merits. According to the 2002 Daywork Drilling Contract, "[e]xcept for such obligations and liabilities specifically assumed by [CAZA], [TEG] shall be solely responsible and assume liability for all consequences of operations by both parties." This was the provision chiefly relied upon by CAZA in seeking summary judgment. Preliminarily, appellants contend this general language cannot control over more specific provisions of subparagraphs 8.1, requiring CAZA to use "all reasonable means" to prevent fires and blowouts, and 8.3, requiring that both parties comply with all federal, state, and local laws, rules, and regulations.

Appellants are correct that when general and specific provisions are inconsistent, the latter control. (Code Civ. Proc., § 1859; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 754, p. 845.) However, as we have seen, the general provision just quoted is not the only provision in the agreement relating to allocation and limitation of liability. Paragraph 14 describes in detail the parties' respective "RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCA-TION OF RISK." Under its terms, each party was to be liable for damage to its own equipment, with certain limited exceptions, and for injury to its own employees. Responsibility for damage to the hole and the underground minerals and for regaining control of a "wild well" was fixed on the operator. Liability for "Pollution and Contamination" was allocated between the parties depending on the cause. Neither party was to be liable for the other's consequential damages. These provisions are more specific with respect to allocation and limitation of liability than the language cited by appellants.

Beyond that, we do not believe that the allocation and limitation of liability provisions are contradicted by subparagraphs 8.1 and 8.3. The latter describes CAZA's duties under the contract. To the extent TEG can establish that CAZA failed to perform these duties, it is entitled to raise that breach as a defense to CAZA's claim for payment under the 2002 Daywork Drilling Contract.[5] The provisions of paragraph 14 are intended to limit contract damages by excluding consequential damages and allocating liability for tort damages for injuries to persons or property in the case of negligence. There is nothing inherently inconsistent in a party to a contract agreeing to do "X," but stating that if it does not, the other party may not recover consequential damages or stating that if negligence occurs during the performance of "X," liability will be limited.

The authorities upon which appellants rely—*Woodall v. Wayne Steffner Productions* (1962) 201 Cal.App.2d 800 [20 Cal.Rptr. 572] and *Continental*

---

[5] Of course, the parties' rights and responsibilities may have been modified by the Payment Schedule and the 2003 Daywork Drilling Contract, neither of which are before us.

*Mfg. Corp. v. Underwriters at Lloyds London* (1960) 185 Cal.App.2d 545 [8 Cal.Rptr. 276]—were decided before the Supreme Court's seminal decision in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*), which we discuss more fully below. Their conclusion that a party cannot limit its liability for a duty it has undertaken to perform by contract when that duty is negligently performed does not represent the current state of the law in this area.

■ Appellants also contend that the provisions of the various subparagraphs of paragraph 14 cannot be read as excluding liability for negligence because negligence was not specifically mentioned in every subparagraph. It is true that " '[f]or an agreement to be construed as precluding liability for "active" or "affirmative" negligence, there must be express and unequivocal language in the agreement which precludes such liability' " and that " '[a]n agreement which seeks to limit liability generally without specifically mentioning negligence is construed to shield a party only for passive negligence, not for active negligence.' " (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1066 [20 Cal.Rptr.3d 562], quoting *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 932–933 [218 Cal.Rptr. 839].) But it is equally true that "[w]hether an exculpatory clause 'covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.' " (*Burnett v. Chimney Sweep, supra*, 123 Cal.App.4th at p. 1066, quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 632 [119 Cal.Rptr. 449, 532 P.2d 97].)

■ Subparagraph 14.13 specifically states that the allocations of liability set forth in subparagraphs 14.1 through 14.12 are "without limit" and "without regard to the cause or causes thereof," including "regulatory or statutory liability," "breach of contract or the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive." Read as a whole, the provisions of paragraph 14 make clear the parties' intent—to limit "the Operator's" ability to recover for injury resulting from accidents, even those caused by the negligence of "the Contractor." As a matter of contractual interpretation, there is nothing to hinder "voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party." (*Tunkl, supra,* 60 Cal.2d at p. 101.) Such an agreement may, however, run afoul of section 1668, to which we now turn.

## III

■ Section 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." As explained in *Tunkl*, early interpretations of this provision expressed the view that section 1668 absolutely prohibited a party from limiting its liability for its own negligence. (*Tunkl, supra,* 60 Cal.2d at p. 95, citing *England v. Lyon Fireproof Storage Co.* (1928) 94 Cal.App. 562 [271 P. 532].) In *Mills v. Ruppert* (1959) 167 Cal.App.2d 58 [333 P.2d 818], however, the court pointed out that "the only use of the word negligent in said section is in a restrictive sense and only in connection with violations of law." (*Id.* at p. 62.) It necessarily followed that " 'contracts seeking to relieve individuals from the results of their own negligence are not invalid as against the policy of the law as therein provided, and hence are neither contrary to public policy nor expressed provision of the law . . . .' " (*Id:* at p. 63; accord, *Werner v. Knoll* (1948) 89 Cal.App.2d 474, 475–476 [201 P.2d 45].)

■ In *Tunkl*, the Supreme Court limited the holding in *Mills v. Ruppert*. The court concluded that exculpatory clauses relieving a party from the consequences of its own negligence cannot be enforced where the public interest was involved, even if the conduct did not involve a violation of law. ■ The court described factors or characteristics which identify a transaction implicating the public interest: (1) the transaction "concerns a business of a type generally thought suitable for public regulation"; (2) "[t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public"; (3) "[t]he party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards"; (4) "[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services"; (5) "[i]n exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence"; and (6) "as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra,* 60 Cal.2d at pp. 98–101, fns. omitted.)

■ Appellants contend these factors are present here. We disagree. Although the Supreme Court did not specifically exclude contracts between

relatively equal business entities from its definition of contracts in the public interest, it is difficult to imagine a situation where a contract of that type would meet more than one or two of the requirements discussed in *Tunkl*. With respect to the second and third factors, for example, CAZA did not hold itself out as performing services for the public, but only for the small number of entities that happened to be oil field operators. While the production of oil is of great importance to the public, the drilling of a particular oil well is generally only important to the party who will profit from it. With respect to the fourth and fifth factors, appellants' argument that it was forced into an adhesion contract boils down to this: "Although two provisions in the agreement were altered during negotiations, we did not know we could alter any provisions during negotiations." The fact that TEG found itself backed into a corner in late 2002 as a result of failure to plan ahead and had no choice but to deal with the only company that had a suitable drill rig available at that specific point in time, is not the sort of unequal bargaining power to which the court in *Tunkl* referred.

*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1 [262 Cal.Rptr. 716], where commercial entities similarly tried to undercut contractual limitations on liability by reliance on *Tunkl*, is instructive. In that case, a rocket manufactured by defendant McDonnell Douglas Corp. failed to boost a communications satellite to the required orbit. As a result, the satellite had to be written off as a total loss. The insurers of the satellite owner sought to recoup their loss from McDonnell Douglas, contending that limitation of liability provisions in the parties' agreement were contrary to public policy. With regard to the plaintiffs' argument that McDonnell Douglas's services were open to any member of the public and provided a service of great importance to some members of the public, the court stated: "[T]he provision of space hardware and launch services is of practical necessity to no individual member of the public; it is of 'practical necessity' only to a few, very large commercial and governmental entities dealing in highly specialized fields such as telecommunications." (*Appalachian Ins. Co. v. McDonnell Douglas Corp., supra,* at p. 29.) Further, "all [sales] were to large, sophisticated commercial and governmental entities." (*Id.* at p. 30.) With regard to the supposedly " 'essential nature' " of the services, the court stated: "*Tunkl*'s focus was on whether the service was 'essential' to individual members of the public. Here, the service is 'essential' only to a small number of large corporations and governmental entities; it 'is not a compelled, essential service' but 'a voluntary relationship between the parties.' (*Okura v. United States Cycling Federation* [(1986)] 186 Cal.App.3d 1462, 1468 [231 Cal.Rptr. 429].) Finally, this case does not involve a 'decisive advantage of bargaining strength [used] against any member of the public who seeks [the] services.' ([*Tunkl*], *supra,* 60 Cal.2d [at p.] 100.) This case does not involve a large entity using its bargaining strength against an individual member of the

public. This case involves two large, sophisticated corporations with relatively equal bargaining power who negotiated the terms of a voluntary agreement." (*Ibid.*, fn. omitted.)

The same is true here. CAZA's services may have been essential to TEG, but the agreement between the parties did not implicate the public interest in the way required to abrogate exculpatory provisions limiting liability for negligence under *Tunkl.*

## IV

If *Tunkl* were the only basis raised by appellants for the applicability of section 1668, we could end our analysis. However, in their cross-complaint and their opposition to the motion for summary judgment, appellants contend that CAZA violated various statutes and regulations in performing drilling activities. They argue that section 1668 invalidates any exculpatory language that would relieve CAZA of liability for performing drilling operations in violation of law "without regard to whether any public interest [was] involved." They cite for support this court's recent decision in *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078 [39 Cal.Rptr.3d 425] (*Capri*).

The plaintiff in *Capri* had joined a health club, signing a membership agreement which contained a release and waiver of liability for injuries caused by the club's negligence. The plaintiff was using the club's outdoor swimming pool when he slipped and fell on the pool deck. After the accident, he noticed an accumulation of algae around the drain in the area where the accident occurred. In defense to the plaintiff's personal injury suit, the club raised the release. However, in his complaint, the plaintiff had alleged that the club violated Health and Safety Code sections 116040 and 116043, which require operators of public swimming pools to maintain them in a sanitary, healthful, and safe manner. Section 116065 of that code made violation of these provisions a crime. In reversing summary judgment in favor of the club, we held that because the plaintiff had alleged that the club violated Health and Safety Code sections 116040 and 116043, and that the violation of these laws was the cause of his slip and fall, the limitation on liability "falls squarely within the explicit prohibition in section 1668 against contractual exculpation for a 'violation of law' and is invalid." (*Capri, supra,* 136 Cal.App.4th at p. 1085.)

We found support for our conclusion in *Hanna v. Lederman* (1963) 223 Cal.App.2d 786 [36 Cal.Rptr. 150], where tenants suffered property damage after fire system sprinklers flooded their leased premises. The landlord allegedly had failed to install the kind of sprinklers required by the municipal

code. The appellate court held that "[s]ince the claim for damages because of negligence embodied in the first cause of action of each tenant was predicated upon the alleged violation of section 94.30312 of the Municipal Code, the exculpatory provision could not be a defense to that cause of action if the evidence showed such violation to be a proximate cause of the tenant's loss." (*Id.* at p. 792.) Similarly, in *Halliday v. Greene* (1966) 244 Cal.App.2d 482 [53 Cal.Rptr. 267], the plaintiffs were injured in a fire to their apartment building while exiting down the only available staircase. The plaintiffs provided evidence of a general industry safety order requiring two escape exits from a work area. The Court of Appeal reversed a nonsuit in favor of defendant, holding that the plaintiffs were entitled to the benefit of the safety order, and hence that the exculpatory clause in the lease agreement was ineffective under section 1668. (*Halliday,* at pp. 487–490.)

*Capri* is significantly different from the present case because it involved personal injury to a consumer. Here, the contract was between two business entities and the damages claimed are entirely economic. In only one recent case has a court applied section 1668 to invalidate provisions in a contract between business entities: *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224 [6 Cal.Rptr.3d 235] (*Health Net*). The agreement at issue there was between Health Net and the Department of Health Services (DHS), and stated that remedies for noncompliance with laws not expressly incorporated into the contract " 'shall not include money damages.' " (*Id.* at p. 229, italics omitted.) In an action against DHS under the agreement, Health Net claimed that DHS had violated a provision of the Welfare and Institutions Code. The trial court agreed and issued an injunction, but refused to award monetary damages because of the limitation of liability provision in the contract. The trial court thought that section 1668 did not apply since the transaction did not affect the public interest within the meaning of *Tunkl.* On review, that decision was reversed because "section 1668 prohibits the enforcement of any contractual clause that seeks to exempt a party from liability for violations of statutory and regulatory law, regardless of whether the public interest is affected." (*Health Net, supra,* at p. 235.)

The holding in *Health Net* does not apply to this case because, as the court explained, the exculpatory clause at issue in that case "prohibit[ed] . . . the recovery of *any damages at all* for DHS's statutory or regulatory violations" and "exempt[ed] DHS *completely* from responsibility for completed wrongs." (*Health Net, supra,* 113 Cal.App.4th at pp. 240–241, italics added.) The court believed that even in a commercial case, "an exculpation of any liability for *any* damages for *any* statutory violation surely rises to the level of an 'exempt[ion] from responsibility' within the meaning of the plain language of section 1668." (*Id.* at p. 239.) The provisions at issue here do not exempt CAZA from all liability, but merely limit its responsibility with respect to economic damages. The court in *Health Net* expressly declined to decide

whether "*some* contractual limitations over the scope of available remedies" would "necessarily run afoul of section 1668." (*Ibid.*, italics added; see *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 74 [70 Cal.Rptr.2d 85] ["Although exemptions from *all* liability for intentional wrongs, gross negligence and violations of the law have been consistently invalidated [citations], we have not found any case addressing a *limitation* on liability for intentional wrongs, gross negligence or violations of the law"].)

Although it did not reach the issue, the court in *Health Net* cited *Klein v. Asgrow Seed Co.* (1966) 246 Cal.App.2d 87 [54 Cal.Rptr. 609] as an example of a case where the court invalidated a provision in a commercial contract that merely limited liability. The plaintiff in *Klein* was a farmer who had purchased mislabeled seed that came with a disclaimer of liability limiting the buyer's damages to the price of the seed. The Court of Appeal upheld a different measure of damages: the difference between the reasonable market value of the crop as actually produced and the value of the theoretical crop that would have been produced had the seed been as labeled. The court concluded that the limitation on liability ran afoul of section 1668 because a provision of the Agricultural Code made the sale of mislabeled seed an unlawful act. (*Klein, supra,* at p. 100.)

The court in *Health Net* did not point out that the decision in *Klein* represented something of an anomaly. In the majority of commercial situations, courts have upheld contractual limitations on liability, even against claims that the breaching party violated a law or regulation. (See, e.g., *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1534–1539 [246 Cal.Rptr. 823] [court upheld a contractual provision precluding consequential damages although a violation of law occurred when a seed seller mislabeled packages of grass seed misrepresenting the percentage of annual rye grass because "[t]he California Uniform Commercial Code expressly allows the limitation or exclusion of consequential damages for commercial loss unless the limitation or exclusion is unconscionable"].) A relatively early case, *Delta Air Lines, Inc. v. McDonnell Douglas Corporation* (5th Cir. 1974) 503 F.2d 239, involved the purchase of an aircraft from the manufacturer by a major airline. The purchase agreement contained an exculpatory clause limiting damages in the case of the manufacturer's negligence. The airline suffered economic damage when the nose gear of the aircraft collapsed during a landing because a part had allegedly been incorrectly installed. On appeal, the airline contended that the limitation of liability clause was "in clear violation of the public policy of California," pointing to section 21.165 of the Federal Aviation Administration (FAA) regulations "which provides in effect that an airplane manufacturer must determine that any airplane proposed for certification is in a condition for safe operation." (503 F.2d at pp. 243–244.) Applying California law, the Fifth Circuit disagreed that the alleged violation of the regulation rendered the limitation of liability

clause invalid under section 1668: "[The airline] . . . confuses a negligence theory of action, under which violation of a law or a regulation may be evidence of negligence, [citation], with the liability that may be imposed by law. [The manufacturer] is still answerable to the FAA and third parties for any responsibility established by the regulation, and any statutory right of action that might be given to [the airline] by FAA regulations has not been abrogated. But none of these causes of action are involved in an action based on common law negligence. We are unable to agree that the contract between two industrial giants fixing the dollar responsibility for [the manufacturer's] alleged negligence would be void under California law, any more than would be an insurance contract which might be written for the same purpose." (503 F.2d at p. 244.)

Nearly a decade after the Fifth Circuit decision in *Delta Air Lines, Inc. v. McDonnell Douglas Corporation, supra,* 503 F.2d 239, the Ninth Circuit addressed the identical issue and reached the same result. (*Airlift Intern., Inc. v. McDonnell Douglas Corp.* (9th Cir. 1982) 685 F.2d 267.) Again seeking to invalidate a contractual limitation on liability, the airline specifically argued that "the exculpation clause was vitiated under state law by [the manufacturer's] violation of federal air regulations." (*Id.* at p. 269.) The court rejected that argument based on the authorities enforcing such clauses in similar situations. (*Ibid.*)

*Continental Airlines v. Goodyear Tire & Rubber Co.* (9th Cir. 1987) 819 F.2d 1519 is to the same effect. That case also involved a limitation of liability provision in a contract for the sale of an aircraft. The airline argued that the exculpatory clause was "unenforceable to the extent that it bars [the airline] from showing that [the manufacturer] violated federal aviation regulations, which violations allegedly caused the accident." (*Id.* at p. 1527.) The Ninth Circuit disagreed: "The exculpatory clause does not permit [the manufacturer] to violate the federal regulations with impunity; it merely bars suit *by* [*the airline*] on this ground. Other sanctions remain in place. As we have said in a similar case, 'nothing inhibits the operation of the regulation[s] in question through [passengers'] suits . . . or sanctions imposed by the [FAA].' " (*Ibid.,* quoting *S.A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 753.)

This line of authority was followed in *In re Air Crash Disaster, Detroit Metro. Airport* (E.D.Mich. 1989) 757 F.Supp. 804, where the court, applying California law, upheld an exculpatory clause in a contract between an airline and an aircraft manufacturer even though some of the airline's claims were based on violation of FAA regulations because "[t]he preclusion of [the airline's] claim would not fully vindicate [the manufacturer] from the adverse repercussions that could result from a violation of federal aviation regulations." (*Id.* at p. 811.) "To the extent that [the manufacturer] violated any

federal aviation regulations, it may be held accountable in the form of civil judgments and/or FAA sanctions. The mere fact that [the airline] is contractually precluded from similarly pursuing [the manufacturer] does not violate the spirit of section 1668." (*Id.* at p. 812.)

While no reported California case has expressly relied on this federal precedent, a similar issue was addressed in *Delta Air Lines, Inc. v. Douglas Aircraft Co.* (1965) 238 Cal.App.2d 95 [47 Cal.Rptr. 518]. There, the court upheld a limitation of liability provision in a contract for the sale of an aircraft against a claim that it involved the public interest as defined by *Tunkl*. The court did not resolve whether a violation of law on the part of the manufacturer would have rendered the provision invalid under section 1668 because it concluded that no such violation had been established. (*Delta, supra,* at pp. 105–106.) Although the lack of a proven violation of law precluded the court from reaching section 1668, in its discussion of the *Tunkl* public interest issue, it indicated that the outcome of the appeal would not have been substantially different had such a violation occurred: "The fact that [the airline] is a regulated enterprise and carries passengers has no relevance to the present decision. The upholding of the exculpatory clause will not adversely affect rights of future passengers. They are not parties to the contract and their rights would not be compromised. They retain their right to bring a direct action against [the manufacturer] for negligence. [Citation.] Also, their right to bring an action against [the manufacturer] for breach of implied warranty would not be interfered with because the passengers were not a party to the contract containing the exculpatory clause. [¶] In short, all that is herein involved is the question of which of two equal bargainers should bear the risk of economic loss if the product sold proved to be defective. Under the contract before us, [the airline] (or its insurance carrier if any) bears that risk in return for a purchase price acceptable to it; had the clause been removed, the risk would have fallen on [the manufacturer] (or its insurance carrier if any), but in return for an increased price deemed adequate by it to compensate for the risk assumed. We can see no reason why [the airline], having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to [the manufacturer], which had neither agreed to assume it nor been compensated for such assumption." (*Delta, supra,* at pp. 104–105, fns. omitted.)

The same public policy issue was addressed more recently in *Philippine Airlines, Inc. v. McDonnell Douglas Corp.* (1987) 189 Cal.App.3d 234 [234 Cal.Rptr. 423], and, once again, the same result obtained. There, alleged negligence in the manufacture of an airplane led to a crash during takeoff and personal injury to a number of the airline's passengers. The passengers filed a lawsuit against the airline, and the trial court ruled that the limitation of liability clause in the airline's contract with the manufacturer barred the

airline's cross-complaint for indemnity. Although it did not point to any specific law or regulation, the airline argued on appeal that the provision created a disincentive for manufacturers to produce safe aircraft and was thus directly contrary to California public policy. The appellate court disagreed: "[C]ontractual allocations of risk in nonconsumer commercial settings are routinely upheld. The reason, we think, lies with our laws of negligence and products liability, and with the economic realities of the marketplace. It may be true, as [the airline] argues, that the ultimate consumer—here the passenger—is provided with a streamlined remedy against the [airline] carrier [and therefore may never have incentive to sue the manufacturer directly]. Given, however, the realities of litigation, and the possibility that [an airline] carrier might have insufficient resources to cover what might be extensive liability should an aircraft malfunction, it would make little economic sense for a manufacturer to place on the market a defective product on the belief that it somehow would be insulated from the personal injury claims of passengers. Moreover, and aside from its potential liability to passengers, a manufacturer whose defective products caused its customers to be sued would not long remain in business. And a manufacturer . . . is still answerable to the Federal Aviation Commission. We are thus of the opinion that the argued 'disincentive' to produce safe aircraft resulting from a finding that the disclaimer of liability at issue is valid, is largely illusory." (*Id.* at p. 242, fn. omitted.)

■ Based on these authorities, we conclude that the challenged provisions in the 2002 Daywork Drilling Contract represent a valid limitation on liability rather than an improper attempt to exempt a contracting party from responsibility for violation of law within the meaning of section 1668. CAZA did not seek or obtain complete exemption from culpability on account of its potential negligence or violation of any applicable regulations. It merely sought to limit its liability for economic harm suffered by TEG. The parties foresaw the possibility that a blowout could occur and agreed between themselves concerning where the losses would fall. Significantly, the agreement required CAZA to accept responsibility for damage to its equipment, injury to its employees, and certain pollution and contamination removal and control activities. Thus, the limitation of liability provisions did not adversely affect the public or the workers employed by CAZA. As appellants concede, CAZA accepted liability for the bodily injury that occurred as the result of the blowout, and has defended and indemnified appellants, through its carrier, in the *Currington* litigation. Under these facts, we agree with the federal courts and the court in *Delta Air Lines, Inc. v. Douglas Aircraft Co., supra,* 238 Cal.App.2d 95: where the only question is which of two equal bargainers should bear the risk of economic loss in the event of a particular mishap, there is no reason for the courts to intervene and remake the parties' agreement.

## V

Finally, appellants made no serious effort to identify a specific law or regulation potentially violated by CAZA so as to trigger application of section 1668. In their cross-complaint, appellants contended that CAZA violated Public Resources Code section 3219, as well as California Code of Regulations, title 14, sections 1722, subdivisions (a) and (c), 1722.2, 1722.5, 1722.6, and 1744, and title 8, sections 3202, 6507, and 6573, subdivision (a). Appellants did not mention any of these provisions in opposing the summary judgment motion. The only reference to a statutory or regulatory violation was in an expert declaration, where Perkin contended that CAZA violated (former) 30 Code of Federal Regulations, part 250.410(b).[6] We asked for clarification in a letter to counsel, and, in one of the sections in their supplemental brief, appellants cited yet another set of statutes: Public Resources Code sections 3714 to 3716, 3724, 3724.1, 3739, 3740, 3754, and 3757.

The statutes cited in the supplemental brief are contained in chapter 4 of division 3 of the Public Resources Code. While division 3 is entitled "Oil and Gas," chapter 4 deals entirely with "geothermal resources" defined as "the natural heat of the earth, the energy, in whatever form, below the surface of the earth present in, resulting from, or created by, or which may be extracted from, such natural heat, and all minerals in solution or other products obtained from naturally heated fluids, brines, associated gases, and steam, in whatever form, found below the surface of the earth, *but excluding oil, hydrocarbon gas or other hydrocarbon substances*." (Pub. Resources Code, § 6903, italics added; see Pub. Resources Code, § 3701.) Since the well involved in this case was not for the production of geothermal resources, the statutory provisions cited in the supplemental brief cannot apply.

The federal regulations quoted in Perkin's declaration, are contained in a subchapter that regulates "oil, gas, and sulphur exploration, development, and production operations *on the outer Continental Shelf*." (30 C.F.R. § 250.101; see § 250.102, italics added.) Obviously, they have no application to this case.[7]

At first glance, the statutory and regulatory provisions cited in the cross-complaint seem more relevant. Public Resources Code section 3219 appears in chapter 1 of division 3, which covers "oil and gas" wells. (Pub. Resources Code, § 3008.) Section 3219 provides: "Any person engaged in operating any

---

[6] The requirements quoted by Perkin now appear at 30 Code of Federal Regulations, part 250.456(d) and (e) (2005).

[7] California Code of Regulations, title 14, section 1744, cited in the cross-complaint, also applies to "wells on offshore sites."

oil or gas well wherein high pressure gas is known to exist, and any person drilling for oil or gas in any district where the pressure of oil or gas is unknown shall equip the well with casing of sufficient strength, and with such other safety devices as may be necessary, in accordance with methods approved by the supervisor, and shall use every effort and endeavor effectually to prevent blowouts, explosions, and fires." But, on examination, the flaw in appellants' attempt to hold CAZA accountable for ensuring compliance with this chapter of the Public Resources Code and the safety regulations promulgated under it becomes apparent.

Section 3219 of the Public Resources Code refers to persons engaged in "operating" oil or gas wells. Section 3009 of the Public Resources Code defines " '[o]perator' " as "any person who, by virtue of ownership, or under the authority of a lease or any other agreement, has the right to drill, operate, maintain, or control a well." It would be stretching the definition of "operator" to include a company performing drilling work by the day. This is confirmed by other statutory provisions found in this chapter of the Public Resources Code, which imposes duties on "the operator" that a drilling company such as CAZA could not reasonably be expected to fulfill. (See Pub. Resources Code, §§ 3203 [operator must file a written notice of intent to commence drilling], 3204 [operator must post an indemnity bond prior to engaging in drilling], 3210–3211 [owner or operator required to keep a log of the history of the drilling of the well showing, among other things, the formations encountered or passed through], 3227 [owner required to file monthly production reports]; *Wells Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 605–606 [61 Cal.Rptr.2d 826] ["It would be illogical to impose upon someone who has no authority or responsibility for a well the duty to: file a notice of intent to drill (§ 3203); post an indemnity bond prior to engaging in drilling (§ 3204); maintain a log of drilling operations (§ 3211); employ specific safety devices on wells and drilling techniques (§§ 3219, 3220); file monthly production reports (§ 3227); or abandon a well in accordance with the instructions of the Division (§§ 3228, 3229, 3230, and 3232)"].)

Review of the governing regulations further illustrates the point that "operator" means something more than a daywork contractor. Section 1722.1.1 of title 14 of the California Code of Regulations requires that there be posted at each well location a sign "with the name of the operator." Section 1722, subdivision (b) of title 14 requires "the operator" to "develop an oil spill contingency plan." Section 1722, subdivision (c) of title 14 requires "the operator" to submit "a blowout prevention and control plan, including provisions for the duties, training, supervision, and schedules for testing equipment and performing personnel drills." Other regulations, while not specifically referencing owners or operators, similarly impose duties that a drilling company hired on a daywork basis could not reasonably be

expected to undertake. Section 1722.2 of title 14 requires wells to have casings "designed to provide anchorage for blowout prevention equipment" and "to withstand anticipated collapse, burst, and tension forces." Sections 1722.3 and 1722.4 of title 14 require cement casings of a certain depth and strength.

Appellants draw our attention to California Code of Regulations, title 14, sections 1722.5 and 1722.6, which are specifically designed to prevent blowouts and "uncontrolled flow of fluids from any well."[8] While neither provision expressly imposes responsibility for compliance on well owners and operators, there is no reason to interpret them as imposing legal responsibility on a contractor like CAZA, when all the other statutes and regulations in this area are clearly directed at the owner or operator.

In short, unlike the plaintiff in *Capri*, appellants have failed to set forth a specific statute or regulation purportedly violated. Accordingly, no basis has been presented that justifies invalidating the exculpatory provisions of the 2002 Daywork Drilling Contract.

---

[8] Section 1722.5 of title 14 of the California Code of Regulations provides: "Blowout prevention and related well control equipment shall be installed, tested, used, and maintained in a manner necessary to prevent an uncontrolled flow of fluid from a well. Division of Oil, Gas, and Geothermal Resources publication No. MO 7, 'Blowout Prevention in California,' shall be used by division personnel as a guide in establishing the blowout prevention equipment requirements specified in the division's approval of proposed operations."

Section 1722.6 of title 14 of the California Code of Regulations provides: "The operational procedures and the properties, use, and testing of drilling fluid shall be such as are necessary to prevent the uncontrolled flow of fluids from any well. Drilling fluid additives in sufficient quantity to ensure well control shall be kept readily available for immediate use at all times. Fluid which does not exert more hydrostatic pressure than the known pressure of the formations exposed to the well bore shall not be used in a drilling operation without prior approval of the supervisor. [¶] (a) Before removal of the drill pipe or tubing from the hole is begun, the drilling fluid shall be conditioned to provide adequate pressure overbalance to control any potential source of fluid entry. Proper overbalance shall be confirmed by checking the annulus to ensure that there is no fluid flow or loss when there is no fluid movement in the drill pipe or tubing. The drilling fluid weight, the weight and volume of any heavy slug or pill, and the fact that the annulus was checked for fluid movement shall be noted on the driller's log. During removal of the drill pipe or tubing from the hole, a hole-filling program shall be followed to maintain a satisfactory pressure overbalance condition. [¶] (b) Tests of the drilling fluid to determine viscosity, water loss, weight, and gel strength shall be performed at least once daily while circulating, and the results of such tests shall be recorded on the driller's log. Equipment for measuring viscosity and fluid weight shall be maintained at the drill site. Exceptions to the test requirements may be granted for special cases, such as shallow development wells in low pressure fields, through the field rule process."

## DISPOSITION

The judgment is affirmed.

Willhite, J., and Hastings, J.,[*] concurred.

---

[*]Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.