
[No. B228487. Second Dist., Div. Four. Dec. 20, 2011.]

FRITTELLI, INC., Plaintiff and Appellant, v.
350 NORTH CANON DRIVE, LP, et al., Defendants and Respondents.
350 NORTH CANON DRIVE, LP, et al., Plaintiffs, v.
FRITTELLI, INC., Defendant.

COUNSEL

Lang, Hanigan & Carvalho and Timothy R. Hanigan for Plaintiff and Appellant.

Perlman & Associates and Dana M. Perlman for Defendants and Respondents.

OPINION

MANELLA, J.—In the underlying action, appellant Frittelli, Inc. (Frittelli), asserted claims for breach of a lease, breach of the implied covenant of quiet enjoyment, negligence, and rescission, alleging that respondents' renovation of a shopping center destroyed Frittelli's business within the center. The trial court granted summary judgment in favor of respondents on Frittelli's claims, concluding that they failed in light of exemptions for lessor liability within Frittelli's lease. We affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

There are no material disputes regarding the following facts: In April 2006, respondents Laurel Karabian and Cynthia D. Norian, as owners of a shopping center in Beverly Hills, entered into a commercial lease with Frittelli, which established a "gourmet doughnut shop" within the center. Alison Winston executed the lease on behalf of Frittelli. Shortly afterward, respondent 350 North Canon Drive, LP (350 North Canon), became the owner of the shopping center. Throughout the underlying events, respondent Personalized Property Management (PPM) managed the shopping center.

The lease consisted of a standard form agreement entitled "Standard Retail/Multi-Tenant Lease—Net," together with several addenda containing supplemental provisions. Pertinent here are several provisions in the form agreement. Although paragraph 38 guaranteed Frittelli quiet enjoyment of its premises provided Frittelli complied with its lease obligations, paragraph 2.12 granted the lessor authority to remodel the shopping center. The remodeling authorization contained a limitation of the lessor's liability for damages due to the renovations, but provided for an abatement of Frittelli's rent in proportion to the degree that Frittelli's use of the premises was impaired.

Paragraph 8 of the lease contained provisions obliging the parties to maintain insurance and exempting the lessor from liability for damages. Paragraph 8.8 provided that "[n]otwithstanding the negligence or breach of th[e] lease by Lessor or its agents," the lessor was exempt from liability for

certain types of injury and damage, including damages from "conditions arising upon the Premises or upon other portions of the building of which the Premises are a part," and "injury to Lessee's business or for any loss of income or profit therefrom." Paragraph 8.8 stated: "[I]t is intended that Lessee's sole recourse in the event of such damages or injury [shall] be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8."

In September 2008, 350 North Canon hired McCormick, Inc., doing business as McCormick Construction Company (McCormick), to make renovations to the shopping center. Karabian and Nourian, together with Peggy Kahn of PPM, met with the tenants to discuss the planned renovation project. After construction on the shopping center began, scaffolding was placed along the center's façade. 350 North Canon arranged for temporary signs to identify each of the tenants; in addition, McCormick moved the awnings naming the stores from the center's façade to the top of the scaffolding. When Winston complained that there was excess dust and dirt in Frittelli's commercial space, 350 North Canon directed its cleaning service to clean each tenant's space every day. 350 North Canon also offered rent concessions to the tenants, including Frittelli.

In April 2009, 350 North Canon began an unlawful detainer action against Frittelli (Super. Ct. L.A. County, No. SC102583). Frittelli, in turn, initiated an action for breach of the lease and negligence against respondents (Super. Ct. L.A. County, No. SC102702). Frittelli's original complaint alleged that the shopping center renovation made it impossible for Frittelli to operate its business in the leased premises. After the actions were consolidated, Frittelli amended its complaint to assert four claims against respondents, namely, breach of the lease, breach of the implied covenant of quiet enjoyment (Civ. Code, § 1927), negligence, and rescission.

Respondents filed a motion for summary judgment, contending that Frittelli's claims failed in view of the general exemption for lessor liability in paragraph 8.8, as well as the limitations on the recovery of damages in paragraph 2.12. The trial court granted the motion and entered judgment in respondents' favor.

## DISCUSSION

Frittelli contends that summary judgment was improperly granted. For the reasons explained below, we disagree.

### A. *Standard of Review*

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.

[Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element X." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Alternatively, the defendant may show the existence of a " 'complete defense.' " (*Id.* at p. 850, quoting Code Civ. Proc., § 437c, former subd. (*o*)(2).)

Although we independently review the grant of summary judgment to determine the existence of triable issues of fact (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56]), our inquiry is subject to two constraints. First, we assess the propriety of summary judgment in light of the contentions raised in Frittelli's opening brief. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126 [36 Cal.Rptr.3d 6]). Second, to determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711 [81 Cal.Rptr.3d 406]; Code Civ. Proc., § 437c, subd. (c).) Here, respondents raised numerous evidentiary objections to Frittelli's showing, which the trial court sustained in part and overruled in part. Because Frittelli does not attack the rulings on appeal, it has forfeited any contentions of error regarding them. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1181 [80 Cal.Rptr.3d 6].)[1]

## B. *Frittelli's Claims*

In assessing the propriety of summary judgment, we look first to Frittelli's allegations in the operative complaint, which frame the issues pertinent to a motion for summary judgment.[2] (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662 [42 Cal.Rptr.2d 669] [" ' "[I]t is [the complaint's] allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory

---

[1] We observe that Frittelli also raised evidentiary objections to respondents' showing in its separate statement of undisputed facts. Because the trial court did not expressly rule on the objections, it presumptively overruled them. (*Archer v. United Rentals, Inc.* (2011) 195 Cal.App.4th 807, 813, fn. 4 [126 Cal.Rptr.3d 118].) As Frittelli has not reasserted its objections on appeal, it has forfeited any claim of error regarding the implied rulings. (*Ibid.*)

[2] The record before us contains no copy of the first amended complaint, against which respondents directed their motion for summary judgment; Frittelli has provided only copies of its original complaint and its second amended complaint, which was filed after respondents sought summary judgment. On appeal, the parties do not suggest that the second amended complaint differs materially from its predecessor. We thus examine the allegations in the second amended complaint.

reasonably contemplated by the opponent's pleading. [Citations.]" ' "].) Here, the operative complaint alleged that Frittelli's business within the shopping center was successful until September 2008, when respondents initiated the remodeling project, which they said would be quickly completed. According to the complaint, the project required scaffolding along the center's façade that impeded customers from seeing and visiting Frittelli's shop, noise and dirt entered the shop, and delays prevented the project's completion until September 2009. The complaint further asserted that the project "completely destroyed [Frittelli's] business."

In connection with Frittelli's claim for breach of the lease, the operative complaint alleged that respondents, through their failure to exercise reasonable care in remodeling the shopping center, contravened the express covenant of quiet enjoyment within the lease and the implied covenant of good faith and fair dealing; furthermore, the complaint alleged that this misconduct was "grossly negligent and/or negligent."[3] Similar allegations supported Frittelli's claims for breach of the implied covenant of quiet enjoyment (Civ. Code, § 1927) and negligence.[4] Regarding the claim for rescission, the complaint alleged that respondents' breach of the lease was "so material and complete" that Frittelli was entitled to rescind the lease and recover its lease payments and "all damages . . . proximately caused by [respondents'] breach of the lease."

## C. Analysis

The principal questions before us concern whether there are triable issues regarding Frittelli's entitlement to damages under the theories alleged in its complaint, in light of the exemption for lessor liability in paragraph 8.8, and other provisions of the lease. In granting summary judgment, the trial court concluded that the exemption shielded respondents from liability for damages for breach of the lease and ordinary negligence, and barred Frittelli's claim for rescission, which was predicated on the lessor's liability for injury and damages from a breach of the lease. Furthermore, to the extent Frittelli asserted a claim for gross negligence, which potentially fell outside the exemption, the court found that the claim failed as a matter of law on the undisputed facts. For the reasons explained below, we discern no error in these rulings.

---

[3] Paragraph 38 of the lease, captioned "Quiet Possession," stated: "Subject to payment by Lessee of the Rent and performance of all the covenants, conditions, and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof."

[4] Civil Code section 1927 provides: "An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same."

### 1. *Governing Principles*

■ We begin by clarifying the principles governing exemptions from liability. To the extent the exemption in paragraph 8.8 purports to shield the lessor and its agents from liability for breaches of the covenants in the lease, it is well established that the tenant under a commercial lease may agree to limit the scope of the covenant of quiet enjoyment, whether express or implied (*Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512–513 [33 Cal.Rptr.2d 572] (*Lee*)), as well as the implied covenant of fair dealing (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371–376 [6 Cal.Rptr.2d 467, 826 P.2d 710]). Courts have affirmed lease terms that exempted the landlord from liability arising from conduct by the landlord (*Kushner v. Home Service Co.* (1928) 91 Cal.App. 692, 696–698 [267 P. 555]) and neighboring tenants (*Conterno v. Brown* (1968) 263 Cal.App.2d 135, 135–137 [69 Cal.Rptr. 393]), as well as lease terms that limited the tenant's remedies for breach of the covenant of quiet enjoyment (*Lee, supra,* 28 Cal.App.4th at pp. 512–513).

■ To the extent the exemption in paragraph 8.8 also purports to shield the lessor and its agents from liability for negligence, the exemption is subject to the public policy disfavoring attempts by contract to limit liability for future torts. (*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 467 [48 Cal.Rptr.3d 271] (*CAZA Drilling*); *Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1065–1066 [20 Cal.Rptr.3d 562] (*Burnett*).) This policy finds expression in Civil Code section 1668, which provides that " '[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his [or her] own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754–755 [62 Cal.Rptr.3d 527, 161 P.3d 1095] (*Santa Barbara*).) ■ Ordinarily, the statute invalidates contracts that purport to exempt an individual or entity from liability for future intentional wrongs (*Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 74 [70 Cal.Rptr.2d 85]) and gross negligence (*Santa Barbara, supra,* 41 Cal.4th at p. 777). Furthermore, the statute prohibits contractual releases of future liability for ordinary negligence when "the 'public interest' is involved or . . . a statute expressly forbids it." (*Farnham v. Superior Court, supra,* 60 Cal.App.4th at p. 74.)

■ Civil Code section 1668 and the underlying public policy control our interpretation of paragraph 8.8, insofar as it applies to tort liability. In view of the principles described above, paragraph 8.8. cannot exempt the lessor from liability for gross negligence. Furthermore, although paragraph 8.8. does not implicate "the public interest" because it is located within a commercial lease

between business entities, it is subject to special scrutiny, insofar as it purports to exempt the lessor from liability for ordinary negligence. (*CAZA Drilling, supra*, 142 Cal.App.4th at pp. 467–468; *Burnett, supra*, 123 Cal.App.4th at pp. 1065–1066.) Even when such exculpatory clauses have no impact upon the public interest, they are " 'strictly construed against the person relying upon them.' " (*Id.* at p. 1066, quoting *Basin Oil Co. v. Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 594 [271 P.2d 122].) "Whether an exculpatory clause 'covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.' " (*Burnett, supra*, at p. 1066, quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 633 [119 Cal.Rptr. 449, 532 P.2d 97].)

### 2.  *Exemption from Liability*

We next examine whether paragraph 8.8 exempts respondents from liability under Frittelli's covenant-based claims (the claims for breach of the lease, breach of the implied covenant of quiet enjoyment (Civ. Code, § 1927), and rescission) and the claim for ordinary negligence. On this issue, the trial court concluded that the exemption in paragraph 8.8 bars the claims as a matter of law on the undisputed facts. For the reasons explained below, we agree.

Although courts have addressed provisions resembling paragraph 8.8 (see *Burnett, supra*, 123 Cal.App.4th at pp. 1066–1067), no published decision has interpreted a liability exemption with the precise language found in paragraph 8.8. Because no extrinsic evidence was submitted regarding the meaning of paragraph 8.8, we determine the parties' intentions as disclosed by the lease itself, looking at the plain language of paragraph 8.8, viewed within the lease as a whole. (*Wu v. Interstate Consolidated Industries* (1991) 226 Cal.App.3d 1511, 1514–1515 [277 Cal.Rptr. 546].) Furthermore, to the extent Frittelli attributed its damages to ordinary negligence, we examine whether paragraph 8.8. clearly discloses an intent to exempt the lessor from liability for such negligence.

The lease before us is titled a "net" lease, which ordinarily signals that "the parties intended to transfer from the lessor to the tenants the major burdens of ownership of real property over the life of the lease." (*Brown v. Green* (1994) 8 Cal.4th 812, 828 [35 Cal.Rptr.2d 598, 884 P.2d 55].) Paragraph 8.8 is located within paragraph 8, which is captioned "Insurance;

Indemnity." Under paragraph 8, Frittelli was required to obtain and maintain commercial general liability insurance and specified insurance policies. (Pars. 8.2–8.5.)

Paragraph 8.8. is captioned "Exemption of Lessor and its Agents from Liability." (Boldface omitted.) It states in pertinent part: *"Notwithstanding the negligence or breach of this lease by Lessor or its agents*, neither Lessor nor its agents shall be liable under *any circumstances* for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee . . . ., whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or *from any other cause*, whether the said injury or damage results from conditions arising upon the Premises or *upon other portions of the building of which the Premises are a part*, or from other sources or places, . . . or (iii) *injury to Lessee's business or for any loss of income or profit therefrom.* Instead, it is intended that Lessee's *sole recourse* in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8." (Italics added.)

In view of the italicized portions of paragraph 8.8, we conclude that the parties' intent, as expressed in the agreement, was to exempt the lessor from liability for breach of the lease and ordinary negligence. Paragraph 8.8, by its plain language, states that the lessor has no liability under "any circumstances" for breaches of the lease and negligence for damages or injury arising from "any . . . cause" in the areas of the shopping center outside the leased premises or for injuries to the lessee's business. This exculpatory language encompasses the facts alleged in Frittelli's complaint.

Furthermore, paragraph 2.12 provides a specific exemption for lessor liability regarding damages arising out of a remodeling of the shopping center. That paragraph, captioned "Common Areas—Remodeling," states in pertinent part: "At any time during the Term, Lessor may remodel or expand, in any manner, the existing Shopping Center . . . . Lessor shall use reasonable efforts to complete any work affecting the Premises in an efficient manner so as not to interfere reasonably with Lessee's business. *Lessee shall not be entitled to any damages for any inconvenience or any disruption to Lessee's business caused by such work*; *provided, however*, the Base Rent paid by Lessee for the period of the inconvenience *shall be abated* in proportion to the degree that Lessee's use of the Premises is impaired." (Italics added.)[5]

---

[5] Frittelli does not dispute that it received 50 percent rent credits in October 2008, November 2008, and January 2009, and a 100 percent rent credit in December 2008.

■ Viewed in context, paragraph 2.12 modifies the lessee's rights regarding the covenant of quiet enjoyment—which is potentially implicated by any remodeling project—in a manner consistent with the general exemption in paragraph 8.8. Absent special lease provisions, when a lessor impairs the use of leased premises without seizing a physical portion of the premises, the lessee may seek damages while retaining possession (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 589 [22 Cal.Rptr.3d 832]), but the lessee's obligation to pay rent *continues* (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 846–847 [122 Cal.Rptr. 114]). Here, paragraph 2.12 reaffirms the lessor's exemption from liability for damages found in paragraph 8.8 in the context of remodeling projects, but provides for an abatement of the lessee's obligation to pay rent. Accordingly, we agree with the trial court that the lease exempts the lessor from liability for breach of the lease and ordinary negligence under the facts alleged in Frittelli's complaint.

### 3. *Frittelli's Contentions Regarding Exemption from Liability*

Frittelli challenges the trial court's ruling on several grounds. As explained below, we reject these contentions.

#### a. *Consistency of Paragraphs 2.12 and 8.8*

■ Frittelli's principal contention is that the damages exemption in paragraph 2.12, properly understood, is inconsistent with the general exemption in paragraph 8.8, and thus displaces it with respect to damages arising from a remodeling of the shopping center. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 754, p. 845 ["Where general and specific provisions are inconsistent, the specific provision will control."].) According to Frittelli, the exemption in paragraph 2.12 encompasses *only* those damages arising from remodeling work that complies with the lessor's obligation imposed in the preceding sentence, that is, work that the lessor has attempted to complete in a reasonable and efficient manner; paragraph 2.12 thus *permits* the lessee to recover damages for unreasonable or inefficient work. Frittelli maintains that unless the damage exemption and lessor obligation are so correlated, the lease provides no mechanism for enforcing the obligation. Furthermore, because this interpretation of paragraph 2.12 places it in conflict with paragraph 8.8, Frittelli argues that paragraph 2.12 controls over paragraph 8.8, as paragraph 2.12 specifically addresses damages arising from remodeling projects.

■ In our view, Frittelli's contention relies on a purported conflict between the lease provisions that finds no support in the lease, viewed as a whole. Generally, an interpretation of a lease that creates conflicts between its provisions must be rejected "when another interpretation serves to harmonize

all the provisions in the lease." (*Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 822 [233 Cal.Rptr. 794].) As explained above (see pt. C.2., *ante*), paragraph 2.12 appears simply to reaffirm the general exemption in paragraph 8.8 in the context of remodeling projects, while providing for an abatement of the lessor's obligation to pay rent. So interpreted, the damages exemption and rent abatement provision in paragraph 2.12 are properly regarded as applying to *all* remodeling work, regardless of whether it complies with the lessor's obligation to remodel in a reasonable and efficient manner. Under this interpretation, there is no conflict between paragraphs 2.12 and 8.8.

Frittelli's interpretation is also unsupported by the language of paragraph 2.12. The damages exemption is immediately followed by the rent abatement provision, which does not harness abatements to work that complies with the lessor's obligation. The sentence containing the exemption provides that the rent shall be abated "*in proportion to the degree that Lessee's use of the Premises is impaired.*" (Italics added.) This phrase establishes a sliding scale for the abatements that does not restrict them to inconveniences from reasonable and efficient work.

In addition, Frittelli's interpretation imposes an unreasonable construction on the damages exemption in paragraph 2.12. Generally, lessees may recover damages for interference with their quiet enjoyment only when "the [lessor's] act or omission . . . substantially interfere[s] with [the lessee's] right to use and enjoy the premises for the purposes contemplated . . . ." (*Andrews v. Mobile Aire Estates, supra*, 125 Cal.App.4th at p. 589.) Under Frittelli's interpretation, the exemption in paragraph 2.12 would bar the recovery of damages solely in relatively unusual circumstances, namely, when remodeling work, though carried out in a reasonable and efficient manner, substantially disrupts the lessee's business.

We further reject Frittelli's contention that the damages exemption in paragraph 2.12 must be construed as a mechanism for enforcing the lessor's obligation to remodel in a reasonable and efficient manner. In *CAZA Drilling*, this court examined a lease that contained broad releases of liability for damages related to certain oil drilling operations, but nonetheless obligated the lessor to use reasonable means to control blowouts. (*CAZA Drilling, supra*, 142 Cal.App.4th at p. 459.) In holding that the lessor's obligation was consistent with the releases, we concluded: "There is nothing inherently inconsistent in a party to a contract agreeing to do 'X,' but stating that if it does not, the other party may not recover consequential damages or stating that if negligence occurs during the performance of 'X,' liability will be limited." (*Id.* at p. 466.)

The same is true here. As noted above (see pt. C.2., *ante*), the exemption in paragraph 8.8 broadly shields the lessor from liability for breaches of the lease, and identifies an insurance claim as the lessee's "sole recourse" in the event of damages. In view of paragraph 8.8, the imposition of a specific obligation on the lessor not enforceable through a damages claim cannot be regarded as anomalous within the lease. Accordingly, we reject Frittelli's proposed construction of paragraph 2.12.

### b. *Active Negligence*

Frittelli contends that even if the damages exemption in paragraph 2.12 applies to all remodeling work, regardless of whether it is conducted in a reasonable and efficient manner, the exemption does not bar the recovery of damages arising from active negligence. He argues that only damages from passive negligence fall under the exemption because it does not contain the term "negligence." We disagree.

Whereas passive negligence involves "mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law," active negligence involves "an affirmative act," knowledge of or acquiescence in negligent conduct, or failure to perform specific duties. (*Rossmoor Sanitation, Inc. v. Pylon, Inc., supra*, 13 Cal.3d at p. 629.) "For an agreement to be construed as precluding liability for 'active' or 'affirmative' negligence, there must be express and unequivocal language in the agreement which precludes such liability. [Citations.] An agreement which seeks to limit liability generally without specifically mentioning negligence is construed to shield a party only for passive negligence, not for active negligence. [Citations.]" (*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 932–933 [218 Cal.Rptr. 839].)

Under this principle of interpretation, a lease may exclude liability for active negligence even though some applicable release provisions do not contain the term "negligence," provided that the lease as a whole clearly establishes the parties' intent to exclude liability. In *CAZA*, the lease contained a general release and several subordinate release provisions. (*CAZA Drilling, supra*, 142 Cal.App.4th at p. 459.) Although some of the release provisions did not mention negligence, the lease contained a clause stating that the provisions encompassed active and passive negligence. (*Id.* at p. 467.) In view of this clause, we concluded that the lease excluded liability for active negligence. (*Ibid.*)

We reach the same conclusion here. Paragraph 8.8 states that "[n]otwithstanding the negligence [of] Lessor or its agents, neither Lessor nor its agents shall be liable under *any* circumstances" for damages arising from "*any* . . . cause" in the areas of the shopping center outside the leased premises or for injuries to the lessee's business. (Italics added.) Because this clause contains the term "negligence," it clearly encompasses damages arising from active negligence in connection with respondents' remodeling of the shopping center. As nothing in paragraph 2.12 suggests that the damages exemption within paragraph 2.12 was intended to displace the general exemption in paragraph 8.8 (see pt. C.3.a., *ante*), the lease as a whole bars Frittelli's claim for active, as well as passive, negligence.

### c. *Scope of Exemption in Paragraph 8.8*

Frittelli contends that its claims fall outside the general exemption in paragraph 8.8. because another provision of paragraph 8 limits the exemption's scope. Paragraph 8.2(a) obliges the lessee to secure a commercial general liability policy protecting itself (and the landlord as an additional insured) from "claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant." As paragraph 8.8 states that the lessee's "sole recourse" in lieu of damages is to file an insurance claim, Frittelli maintains that the general exemption in paragraph 8.8 applies only to damages related to "ownership, use, occupancy or maintenance" of the shopping center, and does not encompass damages from a remodeling project. We reject this contention.

Paragraph 8.2(a) cannot be regarded as establishing the limits of the general exemption. To begin, as noted above (see pt. C.2., *ante*), paragraph 8 contains several clauses obliging the lessee to obtain commercial general liability insurance and specified insurance policies (pars. 8.2–8.5). Paragraph 8.4(b), requires the lessee to maintain business interruption insurance for "direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils." Accordingly, paragraph 8, viewed as a whole, requires the lessee to insure against perils unrelated to damage claims based on "the ownership, use, occupancy or maintenance" of the shopping center.

Furthermore, nothing in paragraph 8.8 suggests that the limits of the general exemption are set by the insurance coverages specified in paragraph 8. Although paragraph 8.8 identifies an insurance claim as the lessee's "sole recourse" in lieu of damages, the paragraph does not provide that the lessee may recover damages to the extent insurance coverage is unavailable; on the

contrary, the exemption in paragraph 8.8 is stated in broad terms unqualified by any reference to insurance coverage. Moreover, paragraph 8.4(c), which is captioned "No Representation of Adequate Coverage," states in bold type: "Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease." (Boldface omitted.) Viewed in conjunction with paragraph 8.8, this provision appears to place the lessee on notice that insurance coverage, although the lessee's sole recourse, may not fully replace the excluded damages. In sum, the exemption in paragraph 8.8 is not limited to damages related to "ownership, use, occupancy or maintenance" of the shopping center.

### d. *Visibility of General Exemption*

Frittelli contends that the general exemption in paragraph 8.8 is unenforceable because it is not sufficiently conspicuous within the lease as a whole. Frittelli relies on the fact that the exemption is printed in the same font size as the other lease provisions and is located in the middle of the lease; in addition, Frittelli notes that Winston stated in a declaration that she was unaware of the exemption when she executed the lease. We reject this contention.

Respondents do not dispute that paragraph 8.8 is located in the standardized portion of the lease. Generally, when a party relies on an exculpatory clause that it has prepared to exempt itself from liability for negligence, "words *clearly and explicitly* expressing that intent of the parties are required." (*Ferrell v. Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 314–315 [195 Cal.Rptr. 90].) "[T]o be effective, an agreement which purports to release, indemnify or exculpate the party who prepared it from liability for that party's own negligence or tortious conduct must be clear, explicit and comprehensible in each of its essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement." (*Id.* at p. 318.)

The application of these principles hinges on the circumstances surrounding the contract, including the nature of the parties and the purpose of the contract. (See *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1057–1058 [107 Cal.Rptr.2d 645] (*Marin Storage*); *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1489 [239 Cal.Rptr. 55] (*Bennett*).) Regarding releases of liabilities by participants in recreational activities, several courts have held

that such releases must be printed so as to be prominent or distinct from other contract provisions. In *Conservatorship of Link* (1984) 158 Cal.App.3d 138, 141–142 [205 Cal.Rptr. 513], the appellate court held that a release required of participants in a car racing event was unenforceable, as it was printed in type smaller than the eight- to 10-point type generally required by statute for several types of retail and consumer contracts. The court remarked that the print type was "so small that one would conclude [that the] defendants never intended it to be read." (*Id.* at p. 141.) In *Bennett*, the appellate court declined to impose a rigid type size requirement on such releases, concluding instead that "[s]ignificant release language must be readable, and . . . not be so encumbered with other provisions . . . ." (*Bennett, supra,* 193 Cal.App.3d at p. 1489.) Applying this standard, the court held that because the release language was "practically the only language on the document," it was not invalid based on its print size. (*Ibid.*) In *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227, 1231, 1233 [71 Cal.Rptr.2d 923], the appellate court found that a release required of a health club's members was ineffective because it was located in the middle of the membership contract, and was distinguished by neither the size of the print nor a suitable heading.

In contrast, in *Marin Storage*, the appellate court held that a release in a standard commercial rental agreement between two businesses was enforceable, even though the release was printed on the back of the agreement in small, difficult-to-read print. (*Marin Storage, supra,* 89 Cal.App.4th at pp. 1047, 1055–1057.) The release exempted the lessor of crane equipment from liability arising from work involving leased cranes. (*Id.* at p. 1047.) The court reasoned that in a commercial setting, the reallocation of risk reflected in the release was not unfair. (*Id.* at p. 1056.) Furthermore, the court determined that because the release was neither hidden nor disguised and the lessee had executed many such contracts, it "had ample opportunity" to discover the release. (*Ibid.*)[6]

▮ In view of the commercial context, we conclude that *Marin Storage* governs here. Under *Marin Storage*, the general exemption is enforceable because Winston had a full and reasonable opportunity to read and understand it. The lease is titled a "net" lease, thereby signaling that it contains significant provisions regarding the lessee's responsibilities concerning the leased premises. Paragraph 8.8 is neither hidden nor disguised: although found in the middle of the lease, it is printed in the same size type as the other provisions, and is captioned in bold print, "Exemption of Lessor and its

---

[6] We recognize that the decision in *Marin* addressed whether the release was unenforceable because it was unconscionable. (*Marin Storage, supra,* 89 Cal.App.4th 1042, 1052–1057.) Although Frittelli does not expressly challenge paragraph 8.8 on the grounds that it is unconscionable, Frittelli's contention is based on considerations central to the analysis of unconscionability. (*Ibid.*) We therefore find guidance from *Marin*.

Agents from Liability." Furthermore, above the signature lines on the lease page is the following provision, printed in block letters: "Lessor and lessee have carefully read and reviewed this lease and each term and provision contained herein, and by the execution of this lease show their informed and voluntary consent thereto. The parties hereby agree that, at the time this lease is executed, the terms of this lease are commercially reasonable and effectuate the intent and purpose of lessor and lessee with respect to the premises." Following this provision, the lease contains an advisement—again printed in block letters—urging the lessee to consult counsel regarding the legal consequences of the lease.

Winston does not dispute that she executed the lease; furthermore, her initials appear on each page of the lease, including the page containing paragraph 8.8. Under the circumstances, the fact that Winston may not have read paragraph 8.8 does not render it unenforceable. (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1080–1081 [122 Cal.Rptr.3d 22] [party was bound by release when nothing prevented him from reading it]; see *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 202 [127 Cal.Rptr.2d 847] [party was bound by contract containing forum selection clause that party had ample opportunity to read and understand, even if party did not read the contract].) In sum, paragraph 8.8 is an enforceable lease provision.

### 4. *Gross Negligence*

We turn to Frittelli's remaining contention, which is predicated on the fact that the lease does not exempt the lessor from liability for gross negligence. Frittelli maintains there are triable issues whether respondents were grossly negligent in remodeling the shopping center. We disagree.

Generally, "[g]ross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages. [Citation.] However, to set forth a claim for 'gross negligence' the plaintiff must allege extreme conduct on the part of the defendant." (*Rosencrans v. Dover Images, Ltd. supra*, 192 Cal.App.4th at p. 1082.) To constitute gross negligence, misconduct must demonstrate "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' [Citations.]" (*Santa Barbara, supra*, 41 Cal.4th at p. 754.) Although gross negligence usually presents a question of fact (*Hall v. Berliner* (1937) 20 Cal.App.2d 193, 195 [66 P.2d 721]), in some circumstances its existence can be resolved as a question of law (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1541 [5 Cal.Rptr.3d 835] [creating promissory note and forbearance agreement in manner that led to loss of appreciation in property value was not gross negligence]).

In seeking summary judgment, respondents submitted evidence that in September 2008, they met with the shopping center tenants to discuss the planned renovation project before it began. After the project began, respondents arranged for temporary signs to identify the tenants, and had awnings naming the stores placed on the top of the construction scaffolding. When Winston complained that the construction created excess dust and dirt in Frittelli's space, respondents directed their cleaning service to clean each tenant's space every day. Respondents also offered rent concessions to Frittelli from October 2008 until January 2009, when Frittelli stopped operating its business. In addition, respondents submitted evidence that months before the project began, Frittelli was experiencing financial difficulties. Frittelli sometimes paid its rent with checks that were not backed with sufficient funds, and were later replaced by good checks; moreover, Frittelli's financial statements, as produced in discovery, showed that it had experienced losses in the months preceding the project.

Frittelli offered no evidence directly challenging this showing, but maintained that respondents' efforts to alleviate the disruption from the project were ineffective. Furthermore, to show gross negligence, Frittelli submitted evidence that Peggy Kahn, the shopping center manager, knew that the project would be disruptive of the tenants' businesses, as the shopping center is located in an area with affluent and selective customers. According to Frittelli's showing, Kahn told the project manager that the tenants would sometimes have to close their businesses due to the project, and further said that the project manager need not worry about Frittelli because it "probably [would not] be residing in [its] space much longer." In addition, Frittelli submitted evidence that although respondents estimated that the project would be completed in no more than six months, it ultimately required a full year due to various delays, including respondents' failure to make a prompt choice regarding the stone to be used in the shopping center's façade.

As it is undisputed that respondents took several measures to mitigate the effects of the remodeling project, we conclude that Frittelli raised no material triable issues regarding gross negligence. In view of the measures undertaken by respondents, their conduct cannot reasonably be regarded as demonstrating a " ' " 'want of even scant care' " ' " or " ' " 'an extreme departure from the ordinary standard of conduct.' " ' " [Citations.]" (*Santa Barbara, supra,* 41 Cal.4th at p. 754.) Although Frittelli's evidence may raise conflicting inferences regarding the measures' effectiveness and Kahn's reasons for believing that Frittelli's business might fail, these conflicts did not preclude summary judgment, as they failed to implicate material facts. Accordingly, summary judgment was properly granted.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.