Filed 4/19/23  Woodbridge Liquidation Trust v. Certain Underwriters etc. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| WOODBRIDGE LIQUIDATION TRUST et al., | B312870 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. 19STCV39191 |
| v. | |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY 0799/REO702, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

Glaser Weil Fink Howard Avchen & Shapiro, Joel N. Klevens and Elizabeth G. Chilton for Plaintiffs and Appellants.

Wood, Smith, Henning & Berman, Tracy M. Lewis and Richard E. Zelonka for Defendant and Respondent.

————————————

Plaintiffs and appellants—primarily entities formed in accordance with a liquidation plan confirmed by a Delaware bankruptcy court—were charged with pursuing assets and claims on behalf of investors defrauded in a billion-dollar Ponzi scheme orchestrated by Robert Shapiro, now imprisoned.[1]  Plaintiffs sued certain underwriters at Lloyd's of London, subscribing to policy 0799/REO702 (Underwriters) to pursue a $3.5 million unpaid claim under an insurance policy for property damage that covered, among other properties, a house in Maui destroyed by fire.  Underwriters moved for summary judgment, arguing the insurance policy was void *ab initio* because—in applying for the policy—the insured failed to disclose it and the property were part of the Ponzi scheme and misrepresented itself as a legitimate commercial lender.  The trial court agreed, granted summary judgment to Underwriters on plaintiffs' complaint, and denied summary adjudication of plaintiffs' breach of contract cause of action.

Plaintiffs contend the trial court erred because the undisputed evidence showed Shapiro's misrepresentations to his investors through the Ponzi scheme were not material to the risk the policy insured—payment of the Maui house's appraised value of $3.5 million if it burned down; there was no evidence that any of the properties insured under the policy, including the Maui property—or any of the loans relating to them—were other than as represented in the policy applications; and there was

[1]     Plaintiff Woodbridge Mortgage Investment Fund 1, LLC (Woodbridge Fund 1), however, was part of Shapiro's Ponzi scheme.  It was named as a co-plaintiff as the primary named insured under the policy at issue.

no evidence of any other misrepresentations or omissions in the applications.

We conclude the uncontradicted evidence establishes Underwriters' rescission defense and affirm.

### FACTS AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts established by the evidence in the light most favorable to plaintiffs as the nonmoving parties. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).)

**1.**      *The parties and the underlying Ponzi scheme*

Plaintiff Woodbridge Fund 1 was part of the group of companies Shapiro created and controlled to act on behalf of his financial services firm Woodbridge Group of Companies, LLC (WGC) in furtherance of a massive Ponzi scheme.[2] The Woodbridge enterprise consisted of WGC, as the principal operating company of the enterprise; funding entities—including Woodbridge Fund 1—that raised money from investors by selling them short-term promissory notes and five-year term "unit offerings" (effectively investments in pooled notes), which purportedly would generate revenues from issuing short-term, secured loans to unrelated third-party property owners; and

---

[2]      A "Ponzi scheme" is an investment fraud scheme that involves payment of claimed returns to existing investors from funds contributed by new investors. From August 2012 through December 2017 between 9,000 and 10,000 investors invested more than $1.29 billion in the Woodbridge Ponzi scheme. Their total losses were estimated to exceed $100,000,000.

a network of more than 200 affiliated entities, created to hold real properties.[3]

In essence, Woodbridge told investors it would use their funds to make short-term, high-interest loans to third-party property owner-borrowers secured by a mortgage on the property at a favorable loan-to-value ratio; the borrowers then would make monthly interest payments to the investors through Woodbridge; and the investors would have a " 'first-position' " lien on the real property as security.[4]  In reality, to the extent the properties existed, they primarily were owned by Woodbridge-affiliated entities—not unrelated third parties—that had no ability to satisfy the loan obligations and interest payments.  And, although investors were told their money was being used to fund loans for specific properties, the funds in fact were commingled into a central bank account controlled by Shapiro.  Shapiro did not use these pooled investor funds only for real property purchases, however, but also to pay commissions to sales agents who sold the Woodbridge " 'investments' " and for his personal slush fund.

With no meaningful cash flow other than from investor funds, Shapiro used new Woodbridge investor contributions to pay " 'interest' and 'principal' " to existing investors.  When it no longer could make payments to investors, WGC, along with

---

[3]     We refer to this scheme and complex web of real estate and investment entities collectively as "Woodbridge."

[4]     Woodbridge thus held itself out as a "hard money" commercial lender—a lender who lends on a short-term basis at a high interest rate.

hundreds of its related and affiliated companies, including Woodbridge Fund 1 (collectively, the Woodbridge debtors), filed for Chapter 11 bankruptcy on December 4, 2017.[5]

Under the liquidation plan confirmed by a Delaware bankruptcy court, plaintiff Woodbridge Wind-Down Entity LLC (Wind-Down) was formed to take ownership of real estate-related assets—formerly owned by the Woodbridge debtors—and sell or otherwise liquidate them to generate cash. Plaintiff Woodbridge Liquidation Trust (the Trust), which owns Wind-Down, was created to receive the cash generated by Wind-Down and distribute it (and other cash) to the creditors—primarily, victims of the Ponzi scheme. Finally, plaintiff WB 8607 Honoapiilani, LLC (Honoapiilani) also is a post-petition entity created to take ownership of the Maui property—the subject of this litigation—to pursue the current claim against Underwriters on behalf of the defrauded investors.[6]

Underwriters are a group of insurance underwriters at Lloyd's of London (Lloyd's) that issued or "subscribed to" the subject insurance policy.

## 2. *The insurance policy*

Riverdale Funding, LLC was an entity within the Woodbridge enterprise. It originated short term, secured loans to unrelated third-party borrowers—rather than disguised Woodbridge affiliates—who needed alternative financing for

---

[5]     Additional Woodbridge affiliated companies filed for bankruptcy in 2018.

[6]     Thus, Underwriters' repeated assertion that *all* the plaintiffs were implicated in the Ponzi scheme is wrong.

real property purchases and refinances.  Its model was to lend up to 65 percent of appraised value, with the loan secured by the underlying real property, charging four to six percent origination fees plus 12 percent per annum for a 12-month term.  The loans generally were funded by a Woodbridge funding entity that would either sell the loan to a third party or retain it.  For non-performing, retained loans, the Woodbridge funding entity generally assigned the right to foreclosure on the property to another Woodbridge-related entity.  The loan on the Maui Property was part of the Riverdale portfolio.[7]

Joshua Latinka was a loan servicer for Riverdale.  He generally was aware Riverdale was affiliated with certain Woodbridge entities—because WGC paid him—but knew nothing about the relationship between them or the nature of the Woodbridge entities' businesses.  Latinka's primary responsibilities were servicing active loans in Riverdale's

---

[7]      In May 2014 Riverdale issued a loan commitment letter to GCP Maui, LLC (Maui LLC), an unrelated third-party property owner, for a one-year loan of $2.73 million secured by the Maui property.  Riverdale assigned the loan commitment letter to Woodbridge Mortgage Investment Fund 2, LLC (Woodbridge Fund 2), a funding entity like Woodbridge Fund 1, that made the loan—from investor funds—secured by a mortgage in its favor on the property.  Woodbridge Fund 2 assigned the mortgage to another Woodbridge entity, Ironsides Investments, LLC (Ironsides).  Maui LLC defaulted on its loan and Ironsides completed its judicial foreclosure on the Maui property in September 2016.  On February 15, 2019, Ironsides granted the Maui property to Honoapiilani under the approved liquidation plan.

portfolio and securing insurance for properties encumbered by mortgages held by Riverdale or its assignees.[8] He worked with independent insurance broker Robert Horenberg to procure insurance coverage for the properties. Horenberg, in turn, contacted All Risks, Ltd.[9] to secure property and general liability coverage for both "lender placed" insurance and "REO" properties in the Riverdale portfolio.[10]

In December 2014 and January 2015, Latinka provided Horenberg with information about the properties to be insured, who gave that information to All Risks. All Risks did not ask Horenberg to provide or obtain a written application from his client before issuing the 2015 policy.

In January 2015, All Risks[11] sent Horenberg an insurance quotation offering property coverage with policy limits of

_____

[8]     The loans on the properties in the Riverdale portfolio were under different names, including Riverdale, Woodbridge Fund 1, Woodbridge Fund 2, or another entity.

[9]     All Risks was a wholesale insurance broker that was a coverholder—meaning it had binding authority—for various insurers in the Lloyd's insurance market. Among other services, it provided insurance underwriting for financial lenders.

[10]     "Lender placed" insurance is secured for properties encumbered by lender-held mortgages to cover the value of the outstanding loan when the borrower fails to maintain property insurance. Insurance for a property owned by a lender after foreclosure is known as "REO"—for "real estate owned"— insurance.

[11]     Thomas Elder was the All Risks underwriter with whom Horenberg originally worked to secure the policy. Elder's

7

$3 million for lender placed properties and $5 million for REO properties, as well as general liability coverage for the properties, under its "Financial Institution Lender Placed/Foreclosed Property" program, which was underwritten through the Lloyd's insurance market. The lender program was available only to financial institutions and other commercial lenders. It insured a lender's entire portfolio of properties during the policy term, permitting the insured to add or delete properties monthly through an on-line system.

The offer had Riverdale as the named insured, but Latinka's supervisor instructed him to name Woodbridge Fund 1 as the primary insured with Riverdale and Woodbridge Fund 2 as additional named insureds. All Risks issued a Confirmation of Insurance on behalf of Underwriters for policy number 0527/REO702, effective from February 2015 through February 2016, providing insurance coverage as quoted, but naming Woodbridge Fund 1 as the insured.

The confirmation noted "Bank" under "Description of Business." Neither Latinka nor Horenberg told All Risks—or anyone else—that Riverdale, Woodbridge Fund 1, or any other Woodbridge entity was a "bank." Rather, Latinka understood Riverdale to be "a commercial lender that issued loans secured by real estate for borrowers who may be unable to qualify for a loan with a traditional lender." He was "generally aware that Riverdale was affiliated with certain Woodbridge entities,"

---

apparent title was "Program Manager, REO/Lender Placed Insurance Program." He left the company at some point before October 2017.

8

as WGC paid him, but was unaware of the business structure or nature of the other Woodbridge entities' businesses.

Latinka added and subtracted properties from coverage under the policy by submitting a monthly report to All Risks through a web-based platform that named the properties and entities to be insured. As properties were added, the premiums were adjusted monthly based on the properties covered that month.

When the 2015 policy was due for renewal, Latinka completed and signed an All Risks Real Estate Owned Property & Liability Application, dated February 11, 2016. The 2016 application identified Woodbridge Fund 1 as the applicant, described the composition of the portfolio to be insured as "Commercial – Non-owner occupied lending based on LTV [loan to value ratio] 50-65%," provided the number of foreclosures during the prior year and to date, and generally identified the properties in the portfolio.[12]

Based on the application, All Risks offered to renew the 2015 policy on similar terms. All Risks issued a confirmation of insurance for policy number 0647/REO702 to Woodbridge Fund 1 as the first-named insured,[13] covering lender placed property,

---

[12] As the application requested, Latinka stated the number of properties by type (e.g., residential, office, occupied, vacant, etc.) and their distribution by state. He identified the specific properties to be insured as "[p]er [the] current schedule and future reports."

[13] Riverdale and Ironsides, along with several other Woodbridge entities, were listed as additional insureds.

9

REO property, and general liability coverage, effective February 20, 2016 through February 20, 2017. All Risks again described Woodbridge Fund 1's business as a "bank" in its confirmation.

In January 2017, Latinka completed an almost identical application to renew the existing policy. All Risks issued an insurance quotation, followed by a confirmation of insurance for policy number 0799/REO702, effective February 20, 2017 through February 20, 2018, for the same lender placed and REO insurance coverage as the 2015 and 2016 policies.[14] The confirmation again described Woodbridge Fund 1's business as a "bank."

**3.** ***The Maui property claims and nonrenewal of the policy***

The Maui property, a residence located at 8607 Honoapiilani Hwy., Lahaina, Hawaii, was added to the 2016 policy in June 2016—through the online system—for lender placed insurance in the amount of the original loan value, $2.73 million. After Ironsides foreclosed on the loan and took title, coverage for the Maui property was changed to REO insurance, effective October 19, 2016, for the appraised replacement cost of $3.5 million. The appraisal was submitted to All Risks.

---

[14] The list of properties insured under the 2016 policy rolled over to the 2017 policy. They would have continued on the schedule of insured properties until removed. Latinka testified he included only Riverdale loans that he was servicing in the 2017 application.

On July 9, 2017, solar panels from the roof, among other things, were stolen from the Maui Property. Horenberg tendered the claim, and Underwriters accepted liability. On November 8, 2017, it ultimately paid $69,275.57 to Woodbridge Fund 1, the primary named insured, although Ironsides held title to the property.[15]

About a month after the theft, on August 3, 2017, a fire destroyed the Maui property. On August 30, 2017, Horenberg submitted a claim for $3.5 million—based on the property's appraised replacement value—for the fire loss on behalf of Woodbridge Fund 1.

In an internal email dated October 20, 2017, an All Risks underwriting manager determined All Risks would not renew the Woodbridge Fund 1 account. The losses on the account "far outweigh[ed] the premium collected." On November 27, 2017, All Risks issued a notice of nonrenewal of insurance on behalf of Underwriters for policy number 0799/REO702, expiring on February 20, 2018. The reason given for the nonrenewal was "loss history." (Capitalization omitted.)

A week later, the Woodbridge debtors filed for bankruptcy —Riverdale was not among them.[16] The next day, December 5,

_____

[15] Horenberg explained the first-named insured—here, Woodbridge Fund 1—acts on behalf of all other insureds. In December 2016, Horenberg confirmed with All Risks by email that Ironsides and other entities were additional insureds under the policy.

[16] Riverdale technically had no employees or separate bank accounts. Woodbridge employed and paid Riverdale's employees and funded the " 'Riverdale loans.' "

2017, Horenberg apparently contacted All Risks about marketing the Woodbridge account to other insurance carriers. On December 14, 2017, he sent a completed application to All Risks, signed by Latinka, "to market for the 2/20/2018 renewal date," and asked All Risks to see if the Lloyd's program would consider offering a renewal at an increased cost due to the losses.[17]

On December 20, 2017, the Securities and Exchange Commission filed a securities fraud case in a Florida federal court alleging Woodbridge was involved in a one-billion-dollar Ponzi scheme. The SEC named as defendants Shapiro, WGC, Woodbridge Fund 1, Woodbridge Fund 2, Ironsides, and other Woodbridge and Woodbridge-affiliated companies. Riverdale was named as a "relief defendant" for allegedly having received proceeds of the fraud that the SEC sought to have disgorged.[18]

On December 22, 2017—in a reply to Horenberg's email transmitting WGC's insurance application—All Risks notified Horenberg that, in view of "the recent losses" and the SEC lawsuit, "we are going to close our file." Around February 27, 2018, Horenberg secured the same type of lender placed/REO

---

[17] The application named WGC as the policy holder, with Woodbridge Fund 1, Woodbridge Fund 2, other Woodbridge entities, and affiliated entities Riverdale and Ironsides, as additional insureds.

[18] A year later, judgment was entered against the debtor defendants, including among others, WGC, Woodbridge Fund 1, Woodbridge Fund 2, Ironsides, and Shapiro. The debtor defendants and Shapiro consented to entry of judgment "without admitting or denying the allegations" of the SEC's amended complaint.

12

insurance policy—with "Woodbridge Mortgage Investment Fund" as the insured—through CRC Insurance Services, Inc. from a different group of Lloyd's underwriters. The policy term was from February 22, 2018 to February 22, 2019.

### 4. *Further proceedings and current action*

On January 23, 2018, the bankruptcy court approved a settlement that formed a replacement board of new managers—with no ties to Shapiro—for the Woodbridge debtors. On February 13, 2018, the bankruptcy court approved the Woodbridge debtors' request, under the direction of the new board, to appoint Bradley D. Sharp as their Chief Restructuring Officer (CRO) and hire his firm as their restructuring advisor, nunc pro tunc to January 26, 2018. The bankruptcy court confirmed the Woodbridge debtors' Chapter 11 liquidation plan in October 2018, and it became effective February 15, 2019.

In April 2019, Shapiro was indicted in a federal court in Florida. He pleaded guilty to conspiracy to commit mail and wire fraud and tax evasion charges and entered into a stipulated factual proffer about the Woodbridge Ponzi scheme. He was sentenced to 300 months in prison and ordered to pay restitution.

Meanwhile, in May 2018, Underwriters' counsel sent Woodbridge Fund 1 a "reservation of rights" letter concerning the fire claim on the Maui property. Woodbridge Fund 1 responded with information and documentation Underwriters had requested, but Underwriters never paid the claim. Accordingly, plaintiffs filed the current action against Underwriters on October 31, 2019, for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, and unfair business practices for refusing to pay the $3.5 million fire claim

13

under the policy.  Among other things, the complaint sought damages and a declaration that the policy covered the claim.

Underwriters answered the complaint on December 4, 2019, generally denying plaintiffs were entitled to coverage of the fire claim under the policy and asserting several affirmative defenses, including "misrepresentation and fraud."  In support of that defense, Underwriters alleged Woodbridge Fund 1 and its agents "misrepresented the nature of its business and held itself out as a legitimate financial institution and/or lender" when in fact the "Woodbridge empire . . . was a billion dollar Ponzi scheme."  Underwriters asked the court to declare the policy void *ab initio.*

5. ***Motions for summary judgment and summary adjudication***

On October 19 and December 16, 2020, respectively, Underwriters moved for summary judgment on plaintiffs' complaint, and plaintiffs moved for summary adjudication of their breach of contract claim.  Underwriters contended they were entitled to recission—meaning the 2017 policy was void *ab initio*, barring all plaintiffs' causes of action—because Woodbridge Fund 1 (1) misrepresented itself as a legitimate bank, and/or (2) concealed that it, the other insureds, and their properties were part of a Ponzi scheme; and (3) had Underwriters known Woodbridge Fund 1 was part of a Ponzi scheme, it never would have issued the policy to it or any related entity.

Plaintiffs argued Underwriters could not rescind the policy as a matter of law because the Ponzi scheme was immaterial "to the risk assumed and underwritten by . . . Underwriters"— physical damage to the insured properties—and the Maui property was not one of the Ponzi's scheme's sham loans; and

14

Woodbridge Fund 1 answered the questions in the policy application accurately and completely.

Plaintiffs conceded, however, that (1) the funding for the Riverdale loans came from Woodbridge investor money; and (2) Woodbridge Fund 2 continued to assign interests in the Maui property mortgage to its investors despite no longer holding the mortgage or any interest in the property.

The trial court heard both motions on March 1, 2021. At the hearing, plaintiffs' counsel argued,

> "[T]he fundamental question . . . is whether the Ponzi scheme was material to the risk that the Underwriters insured."

> "[T]he criminality, which is undisputed— the criminality of the Woodbridge group of companies in no way impacted the risk which the carrier agreed to undertake. [¶] That risk was affected by whether these loans were real, whether the mortgages were real, whether foreclosures were real, whether the properties were real. And the answer to all those questions based on undisputed evidence in this record with respect to the properties that were insured . . . is undisputedly 'yes,' not even a dispute."

Counsel did not dispute there was a Ponzi scheme, but argued it was "unrelated criminality that ha[d] nothing to do with increasing or affecting in any way" the risk Underwriters undertook to insure.

Underwriters argued it would not have issued the policy had it known the truth about Woodbridge. Only commercial

15

lenders and other financial institutions were eligible for the insurance program the policy fell under, and Woodbridge and its agents misrepresented the insureds were legitimate commercial lenders when in fact they were formed and used in furtherance of the Ponzi scheme. Counsel asserted that every property insured under the policy was tied up in the Ponzi scheme. In response, plaintiffs' counsel noted plaintiffs were not trying to recover money for themselves or Shapiro, but for the innocent Woodbridge investors who were duped by the Ponzi scheme. Counsel argued Underwriters were engaging in post-claim underwriting on an "unrelated criminality" to walk away from covering a legitimate $3.5 million fire claim and re-victimize the injured investors.

The trial court took the matter under submission. On March 3, 2021, the court entered its order granting Underwriters' motion for summary judgment. The court simultaneously entered a separate order denying plaintiffs' motion for summary adjudication as moot. Although the court concluded Woodbridge Fund 1 did not misrepresent itself as a "bank," it found that, "[b]ut for Woodbridge Fund 1's misrepresentation . . . that it was a 'commercial lender' with a legitimate lending portfolio when it was not . . . [Underwriters] would not have been induced to offer the Policy as renewed because this type of policy was for banks, commercial lenders, and/or financial institutions." The court concluded "[t]his was a misrepresentation and/or concealment and it was material." The court rejected plaintiffs' contention that the legitimate nature of the insured loans and properties precluded recission of the policy. The court explained, "Simply put, a few legitimate loans to unrelated parties does not cure a failure to disclose the fact that Woodbridge Fund 1 was operating

16

as part of a Ponzi scheme and the Property was a necessary part of that scheme."

Three weeks later, on March 25, 2021, the court entered Underwriters' proposed judgment over plaintiffs' objection.[19]  On May 18, 2021, the court entered an amended judgment adding the $9,874.71 in costs Underwriters had requested through a memorandum of costs.  Plaintiffs appealed from the judgment.

## DISCUSSION

Plaintiffs contend Underwriters were not entitled to rescind the policy as a matter of law because Woodbridge Fund 1 did not misrepresent or conceal any facts in the insurance application and the Ponzi scheme was immaterial to the risk the policy insured—property damage due to fire or other perils.  As a result, plaintiffs argue the trial court erred in granting Underwriters' motion for summary judgment.  They also argue the court erred in denying their motion for summary adjudication of their breach of contract cause of action because the undisputed facts establish the policy covered the Maui property, it was destroyed by a covered peril, the premiums and claim were

---

[19]    Because the policy had been rescinded, the court ordered Underwriters "to refund the premiums to Plaintiffs from the inception of the Policy . . . offset by the claims paid by Defendant to Plaintiff from the inception of the Policy."  The proposed judgment included that calculation based on premiums paid on the policy in effect from February 20, 2017 to February 20, 2018. Plaintiffs argued they should have been refunded premiums paid from the date the policy originally issued in February 2015.  As they have not raised this issue on appeal, it is forfeited.  (*Foxen v. Carpenter* (2016) 6 Cal.App.5th 284, 295 [failure to raise a claim of error in the opening brief forfeits the argument].)

17

timely made, the claim was within the policy limits, and Underwriters never paid the claim.[20]

Underwriters contend summary judgment was proper because the undisputed facts show Woodbridge Fund 1 misrepresented it was a legitimate commercial lender and concealed that it was a part of a Ponzi scheme in applying for the policy, and All Risks never would have offered or bound the policy for Underwriters had it known those true facts.

1. ***Summary judgment and standard of review***

Summary judgment is proper if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code. Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A defendant moving for summary

---

[20] Underwriters assert the denial of plaintiffs' motion for summary adjudication is not properly before us because plaintiffs did not file a timely writ petition. They are mistaken. As plaintiffs note, an appeal from a final judgment includes any interlocutory ruling or decision that involves the merits or affects the judgment appealed from. (Code. Civ. Proc., § 906.) In any event, as we affirm the summary judgment, plaintiffs' appeal from the denial of their motion for summary adjudication is moot. (See *Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 192 (*Superior Dispatch*) [misrepresentation or concealment of material fact in an insurance application "establishes a complete defense in an action on the policy"]; *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 184–185 (*Sogomonian*) [rescission of insurance policy based on material concealment or misrepresentation extinguishes all rights of insured except to recover paid consideration].)

judgment based on an affirmative defense, as is the case here,[21] " ' " 'has the initial burden to show the undisputed facts support each element of the affirmative defense' . . . . If the defendant does not meet this burden, the motion must be denied." [Citations.]' " (*Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 400 (*Shiver*).)

If the defendant makes a sufficient showing, the burden then shifts to the plaintiff to show there is a triable issue of material fact concerning the defense. (*Shiver, supra,* 24 Cal.App.5th at p. 400.) "A triable issue of material fact exists only if 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.,* quoting *Aguilar, supra,* 25 Cal.4th at p. 850.)

On appeal from a summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist. (*Saelzler, supra,* 25 Cal.4th at p. 767; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We "view the evidence in a light favorable" to plaintiffs as the nonmoving parties, "liberally construing" their evidence while "strictly scrutinizing" defendants', "resolving any evidentiary doubts or ambiguities" in plaintiffs' favor. (*Saelzler,* at p. 768.) We consider all evidence the parties submitted in connection with

---

[21] Underwriters' answer did not include an affirmative defense of "rescission." The trial court noted its defense for "misrepresentation and fraud" was substantially the same as rescission because it asked the court to deem the policy void. The trial court thus "overlook[ed] this harmless defect." Plaintiffs do not contend it erred in doing so.

the motion, except that which the court properly excluded. (*Merrill v. Navegar Inc.* (2001) 26 Cal.4th 465, 476.)

## 2. *Insurer's right to rescission*

Under Insurance Code sections 331 and 359,[22] when an insured misrepresents or conceals a *material* fact in applying for insurance, the insurer is entitled to rescind the insurance policy. (§§ 331 ["Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."], 359 ["If a representation is false in a material point . . . the injured party is entitled to rescind the contract from the time the representation becomes false."]; see also *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 156 Cal.App.4th 1259, 1266 (*LA Sound*).) " '[A] rescission effectively renders the policy totally unenforceable from the outset so that there was never any coverage and no benefits are payable.' " (*LA Sound*, at p. 1267.) In other words, the policy is void *ab initio*—as if it never existed—and cannot be breached. (*Id.* at p. 1266.)

"A representation is false when the facts fail to correspond with its assertions or stipulations." (§ 358.) Concealment, in turn, is "[n]eglect to communicate that which a party knows, and ought to communicate." (§ 330.) Moreover, the Insurance Code requires each party to an insurance contract to disclose, "in good faith, all facts within [the party's] knowledge which are or which [the party] believes to be material to the contract . . . and which the other has not the means of ascertaining." (§ 332.) Thus, "sections 331 and 359 are part of a larger statutory framework

---

[22] Undesignated statutory citations are to the Insurance Code.

20

that imposes 'heavy burdens of disclosure' 'upon both parties to a contract of insurance, and any material misrepresentation or the failure, whether intentional or unintentional, to provide requested information permits recession of the policy by the injured party.' " (*Mitchell v. United National Insurance Co.* (2005) 127 Cal.App.4th 457, 468 (*Mitchell*), citing *Sogomonian, supra,* 198 Cal.App.3d at pp. 179–180.)

"Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." (§§ 334, 360 [same rule for materiality of a representation].) "The test for materiality is whether the information would have caused the underwriter to reject the application, charge a higher premium, or amend the policy terms, had the underwriter known the true facts." (*Mitchell, supra,* 127 Cal.App.4th at p. 474; see also *Torbensen v. Family Life Ins. Co.* (1958) 163 Cal.App.2d 401, 405 [misrepresentation material where, had the insurer "known the true facts[,] it would have made further inquiries or would have been influenced materially in its decision in accepting the risk"].) "This is a subjective test viewed from the insurer's perspective. [Citation.] Thus, a misrepresentation or concealment is material if a truthful statement would have affected the insurer's underwriting decision." (*Superior Dispatch, supra,* 181 Cal.App.4th at p. 191; see also *Sogomonian, supra,* 198 Cal.App.3d at p. 181 ["critical question is the effect truthful answers would have had on [that insurer], not on some 'average reasonable' insurer"].)

The insurer bears the burden of proving the insured made a false representation or omission in the insurance application

21

that was material to the issuance of the insurance coverage. (*Thompson v. Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 919 (*Thompson*) ["the burden of proving misrepresentation rests upon the insurer"]; *Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 57 (*Duarte*) [insurer has burden to prove that in application for insurance, "whether intentionally or not," insured made a misrepresentation and insurer would not have issued the policy if that misrepresentation had not been made]; *Olson v. Standard Marine Ins. Co.* (1952) 109 Cal.App.2d 130, 137 (*Olson*) [insurer bears burden of proof as to insured's concealments and their materiality].)  The insurer need not demonstrate " 'an actual intent to deceive,' " however, or "a causal relationship between the material misrepresentation or concealment of material fact and the nature of the claim." (*Duarte*, at p. 53; see also *LA Sound, supra*, 156 Cal.App.4th at p. 1270 [" 'misstatement or concealment of "material" facts is ground for recission even if unintentional' " (italics omitted)]; *Sogomonian, supra*, 198 Cal.App.3d at pp. 174–175, 180–181 [insurer entitled to rescind policy based on insured's failure to disclose prior land subsidence and water damage claims where loss at issue due to fire].)  Nevertheless, "the validity of an insurance contract . . . is not affected by concealment or misrepresentations that do not relate to material matters." (*Leasure v. MSI Insurance Co.* (1998) 65 Cal.App.4th 244, 248.)

Summary judgment for an insurer seeking recission has been found appropriate where the only reasonable conclusion to be drawn from the undisputed evidence presented is that "the false negative answers and omissions of [the applicant] were material to [the insurer's] decision to provide insurance coverage."  (*Sogomonian, supra*, 198 Cal.App.3d at p. 182.)

22

3. ***Underwriters presented evidence establishing plaintiffs concealed or misrepresented a material fact***

Plaintiffs argue Underwriters' rescission defense fails as a matter of law because there is no evidence of any misrepresentation or omission in any of the policy applications "remotely material to the risk of fire or other property damage," the Ponzi scheme was not relevant to the insured risk, and the policy insured only "real" secured loans made to third-party borrowers, not the "fake" loans sold in furtherance of the Ponzi scheme.

 a. *The uncontroverted evidence establishes Woodbridge Fund 1 concealed or misrepresented the true nature of its business in applying for the policy*

We begin with what the record shows Woodbridge Fund 1 did not misrepresent. First, we agree with the trial court that Woodbridge Fund 1 did not represent itself as a "bank" to All Risks in its applications for insurance. All Risks gave it that designation after accepting the application. Bill Evans, who took over underwriting oversight at All Risks in the fall of 2017,[23] testified All Risks describes a "lender" as a "bank" for its "purposes of underwriting." The terms were interchangeable "from an underwriting standpoint." He confirmed Woodbridge Fund 1 did not use the term "bank" to refer to itself.

Second, as plaintiffs assert, Underwriters presented "no evidence . . . show[ing] that the loans and properties insured

---

[23] Evans is the current Vice President of National Programs for the company with which All Risks merged in 2020.

23

under the 2017 [p]olicy were not commercial loans with a loan to value ratio of 50-65%, exactly as stated in the 2017 Application." Latinka declared that, before submitting the 2016 and 2017 written applications to All Risks, he confirmed he had answered everything completely and accurately, including that "the composition of [Woodbridge Fund 1's] real estate lending portfolio had a [loan-to-value] ratio of 50-65%," and the properties to be insured were described properly under the categories provided in the applications.

As the trial court noted, however, that Woodbridge Fund 1 did not misrepresent or withhold information specifically asked for in the written application form does not mean it did not misrepresent or conceal a material fact in applying for insurance. Underwriters presented undisputed evidence establishing that, in applying for the policy, Woodbridge Fund 1 held itself out as a *legitimate* hard money commercial lender and/or failed to disclose it was part of a Ponzi scheme.

Plaintiffs do not dispute that, when Woodbridge Fund 1 applied for the policy in 2015, 2016, and 2017: Woodbridge Fund 1 and its affiliates were operating as part of an active Ponzi scheme; the Riverdale portfolio loans insured under the policy were funded with commingled investor money that necessarily would have included money the Ponzi scheme raised through sham loans;[24] and, despite no longer having a mortgage interest

---

[24] Sharp testified Riverdale itself did not fund any of the loans in its portfolio—a Woodbridge fund entity did. It is undisputed the Woodbridge fund entities commingled the money they raised from investors. Hence, the funding for the Riverdale

24

in the Maui property, Woodbridge Fund 2 made fraudulent assignments of that mortgage to "numerous" victims of the Ponzi scheme. Plaintiffs concede Woodbridge Fund 1 did not disclose any of these facts to All Risks.

Plaintiffs also concede the "[p]rogram's availability and premium rates are only available to financial institutions and commercial lenders." By applying for an insurance program it knew was limited to commercial lenders and financial institutions, Woodbridge Fund 1 necessarily held itself out as a *legitimate* commercial lender when it was not.[25] (§ 358 ["representation is false when the facts fail to correspond with its assertions"].) Moreover, Horenberg—plaintiffs' witness— declared he "never stated or otherwise implied to any person at All Risks that . . . Riverdale, or any Woodbridge entity that was a named insured under the Policy," including Woodbridge Fund 1, was "anything other than a commercial lender." (§ 350 [misrepresentation may be oral].)

---

loans would have included money raised from investors duped into investing in the "fake" loans.

[25] Plaintiffs contend Woodbridge Fund 1 was a legitimate commercial lender for purposes of the Riverdale portfolio. Sharp testified he did not consider Woodbridge Fund 1 not to be a legitimate lender in January 2017 because "at that time, [it] had legitimate commercial loans." But, as there is no dispute Woodbridge Fund 1's hard money lending business was part of a criminal enterprise, no reasonable juror would call it a "legitimate" commercial lender. Even if a triable issue of fact exists as to whether Woodbridge Fund 1 affirmatively misrepresented itself as a commercial lender, it is undisputed it concealed its participation in the Ponzi scheme.

Accordingly, the undisputed evidence demonstrates Woodbridge Fund 1 concealed (or misrepresented) the true nature of its business—an integral part of a billion-dollar Ponzi scheme—when it applied for the policy. Underwriters also met their initial burden to show Woodbridge Fund 1's concealment (or misrepresentation) was material. Evans declared that, had All Risks known Woodbridge Fund 1 was "engaged in a Ponzi scheme disguised as a legitimate hard money lending business," it would not have offered, underwritten, bound, or issued the 2017 policy, and Underwriters would not have permitted it to do so nor offered coverage to Woodbridge Fund 1 or its affiliated companies.[26] We thus consider whether plaintiffs met their burden to demonstrate a jury could find Underwriters failed to establish Woodbridge Fund 1's involvement in the Ponzi scheme was material to its decision to issue the policy.

---

[26] Evans was not involved in underwriting the policy for Woodbridge Fund 1, but he was familiar with the underwriting process and All Risks' lender program, and he reviewed the information Woodbridge Fund 1 provided to All Risks during its underwriting of the policy. Plaintiffs objected to portions of Evans's declaration based on lack of personal knowledge and foundation. The court overruled one such objection, but did not rule on the others, as immaterial to the court's ruling. The court also did not rule on plaintiffs' objection to a portion of defendants' counsel's declaration for the same reason. Plaintiffs do not challenge those evidentiary rulings on appeal. (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 [failure to challenge evidentiary ruling on appeal "forfeit[s] any contentions of error regarding them"].)

b. *Woodbridge Fund 1's active role in a criminal enterprise involving its purported hard money lending business was material to the issuance of the policy*

Plaintiffs primarily argue that, because the Ponzi scheme was neither "directly relevant to the precise kind of risk [Underwriters] was being asked to cover"—property damage due to fire and other physical perils—nor relevant to whether the insured properties were as the application represented them to be, its nondisclosure cannot support recission of the policy as a matter of law.  (See *Merced County Mut. Fire Ins. Co. v. State of California* (1991) 233 Cal.App.3d 765, 773 [explaining "cases allowing rescission for a material misrepresentation involve a misrepresentation regarding the nature of the risk to be insured"].)

As we discussed, Underwriters presented no evidence showing Woodbridge Fund 1 answered any of All Risks' application questions incorrectly or incompletely.  Plaintiffs also presented evidence—through Sharp's and Latinka's declarations—the properties to be insured under the policy were from the Riverdale portfolio alone and "were real properties encumbered by loans to third[-]party borrowers that were secured by legitimate documented mortgages" or—where the third-party borrower defaulted—were foreclosed REO properties.[27]  Specifically, the evidence showed the loan on the Maui property was a "legitimate

---

[27] As CRO, Sharp led and supervised a team of forensic accountants who examined "tens of thousands of documents and analyzed in detail all aspects" of the Woodbridge Ponzi scheme.

loan" made to an unrelated third-party borrower, secured by a documented mortgage on the property, and later, legitimately foreclosed on by Woodbridge Fund 2's assignee, Ironsides.

The parties agree "[t]he Ponzi scheme generally involved the sale to unsuspecting investors of interests in loans that were secretly made between two Woodbridge affiliates, or in loans that were never made, or for properties that were never purchased."[28] Accordingly, because the evidence demonstrates the insured loans and real properties all were "real," and their notes and foreclosures legitimately obtained, plaintiffs argue— as they did below—Woodbridge Fund 1's involvement in the Ponzi scheme "in no way impacted the risk which the carrier agreed to undertake" and thus was immaterial for purposes of rescission. Plaintiffs discuss several cases to support this position—that to have been material, the Ponzi scheme must directly have affected the risk that Underwriters would have to pay out a property loss claim.[29]

---

[28] We use the term "fake" or "sham" loan to refer to any of these scenarios.

[29] We need not address each of the cases plaintiffs cite. Generally, they involve circumstances where the insured misrepresented or concealed information in response to the insurer's inquiries about the subject matter of the policy in an insurance application. (See *Thompson, supra*, 9 Cal.3d at pp. 915–916 ["The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law."].)

For example, in *Mitchell*, the insurer established its right to rescind a fire insurance policy for a commercial building destroyed in an arson fire where the insured's application misstated the building's size, the income it generated, its intended use as an owner-occupied business, that it had a burglar alarm and no uncorrected fire code violations, and that it was uninsured when it had coverage under a program of " 'last resort' "—a red flag in the insurance industry. (*Mitchell, supra*, 127 Cal.App.4th at pp. 463–465.) The court found the misrepresentations material as a matter of law, explaining the insurer specifically asked for the information, and it "went directly to questions of insurability, risk, and premium." (*Id.* at p. 476.)

Similarly, in *Sogomonian*, an insurer that had issued a homeowner's insurance policy on a home destroyed by fire properly rescinded the policy where the insureds denied having had prior losses, cancellations, and renewal refusals, but the property in fact had suffered prior landslide and theft losses, a prior homeowner's policy had been cancelled, and their current policy had not been renewed for substandard property maintenance. (*Sogomonian, supra*, 198 Cal.App.3d at pp. 174–176.) The court held that undisputed evidence—and the insurer's testimony about the importance of the information to its decision making—established materiality as a matter of law by "the nature of the insurance coverage which the defendant sought, the quality and quantity of the information which was not disclosed and the fact that [the insurer] specifically requested the information on its application and thereafter relied upon it in issuing the policy." (*Id.* at p. 182.)

Plaintiffs argue that in these cases—and others like them—the court found the concealments and misrepresentations material because "they involved information which was directly relevant to the very kind of risk which the policies were intended to cover," and the insurers specifically had asked for the information. Thus, in *Sogomonian*, although the property was damaged by fire, the misrepresented and concealed information about the earlier loss due to land subsidence, and nonrenewal due to substandard maintenance, were related directly to the risk of property damage insured by the homeowner's policy. Likewise, in *Mitchell*, the insured's false and omitted answers about the building and its business directly concerned the fire risk being insured. Plaintiffs argue there is no evidence Woodbridge Fund 1's involvement in the Ponzi scheme similarly was related to the risk of fire or other property damage the policy insured against, as that information did not affect the properties' size, use, condition, value, or prior insurance claims or losses, nor did it affect the legitimacy of the mortgages or foreclosures on the properties.

We disagree with plaintiffs' assessment of the relevance of Woodbridge Fund 1's participation in the Ponzi scheme to the decision to issue and renew the Policy. "[A] misrepresentation or concealment is material if a truthful statement would have affected the insurer's underwriting decision." (*Superior Dispatch, supra*, 181 Cal.App.4th at p. 191.) We cannot imagine how an insured's active participation in an ongoing criminal enterprise by selling duped investors interests in sham real estate loans could not directly have affected an insurer's decision to issue it any type of policy, much less one designed to provide coverage for commercial lenders' lending portfolios. True, that information

30

might not bear directly on the risk of fire or damage to the properties proposed to be insured, but it would be very relevant to whether the insurer would want to enter a contractual relationship with the insured at all. (See *Mitchell, supra*, 127 Cal.App.4th at pp. 468–469 ["Requiring full disclosure at the inception of the insurance contract and granting a statutory right to rescind based on concealment or material misrepresentation at that time safeguard the parties' freedom to contract."].) Among other things, an insured's involvement in criminal fraud—even if that fraud did not directly affect the insured risk—bears directly on the risk of the insured submitting a fraudulent insurance claim or not paying its premium or embroiling the insurer in the insured's criminality.

Indeed, as we discuss below, All Risks' application specifically asked if the applicant had been convicted of crimes of fraud *or* arson. If All Risks and Underwriters were concerned only with an increased risk of fire loss, they would have limited the question to arson. Moreover, as we said, materiality is "viewed from the insurer's perspective," and Underwriters presented evidence establishing All Risks would not have offered, bound, or issued the policy for Underwriters had it known Woodbridge Fund 1 was part of a billion-dollar Ponzi scheme. (*Superior Dispatch, supra*, 181 Cal.App.4th at p. 191.)

Nevertheless, plaintiffs argue the Ponzi scheme is unrelated "after-discovered criminality" that cannot support rescission, akin to the facts in *Olson, supra*, 109 Cal.App.2d 130. There, the court affirmed a verdict in favor of insureds where the insurer rescinded a floater policy covering jewelry and furs, after covered items were stolen, on the ground the insureds concealed they had "operated houses of prostitution," one had been arrested

31

for prostitution several times, and they had had other insurance policies canceled. (*Id.* at pp. 132, 134, 137, 141.) The court could not conclude as a matter of law that the earlier policies had been canceled due to the insureds' "prior immoral activities and arrests, the last of which had occurred five years before" or that the current insurer "would have refused to issue the policy if it had known of them." (*Id.* at p. 138.) Moreover, the insurer had not asked the insureds about any prior canceled policies or their criminal history. (*Id.* at pp. 138–139.) Quoting from a federal appellate case, the court stated: " 'We think the correct rule is that where, as here, the insurer fails to question the insured, the latter cannot be said to have concealed facts so as to void the policy unless they are facts which he knows, or which a reasonable man should have known, to be material to the risk and unless he does so for the purpose of obtaining insurance which could not have been obtained after a disclosure of such facts.' " (*Id.* at p. 138; see also *Maryland Casualty Co. v. National American Ins. Co.* (1996) 48 Cal.App.4th 1822, 1832 (*Maryland Casualty*) [same].)

*Olson* is inapposite. Critically, the concealed illegitimate activity here—the Ponzi scheme—did not occur years in the *past* as in *Olson* but was active and ongoing when Woodbridge Fund 1 applied for the initial policy and its renewal. And, while there was no evidence the insureds in *Olson* continued to run houses of prostitution, it is undisputed Woodbridge Fund 1 was funding the Ponzi scheme in 2017. The insurer in *Olson* also did not ask the insureds about their criminal or prior loss history. Here, in contrast, the 2017 renewal application specifically asked, "During the last 5 years . . . has any applicant been indicted for or convicted of an[y] degree of the crime of fraud, bribery, arson,

or any other arson-related crime in connection with this or any other property?" Whether an applicant had been convicted of fraud thus was important to Underwriters. There is no question that an applicant's *current* participation in a fraudulent scheme would be equally important.

Yet, no reasonable juror could conclude All Risks should have asked its applicants if they *currently* were engaged in fraud for them to understand that information would be material to its issuance of the policy. To do so would be pointless—no applicant participating in an active criminal enterprise would answer that question honestly, in contrast to a question about past crimes or policy cancellations. (Cf. *Maryland Casualty, supra*, 48 Cal.App.4th at p. 1832 [insurer failed to establish insurance coverage negated as a matter of law based on insured's concealment of prepolicy property damage where insurer produced no evidence it asked insured about prepolicy property losses].) Although an insurer's specific questions in an insurance application generally are "sufficient to establish materiality as a matter of law," an affirmative inquiry is not necessarily required to do so. (*Thompson, supra*, 9 Cal.3d at pp. 915–916.) Certainly, a reasonable person in Woodbridge Fund 1's shoes "should have known"—without being asked—its active participation in a Ponzi scheme involving sham real estate loans would be material to an insurer's decision to underwrite a policy covering a lending portfolio, and if it had known the true facts, it would not have issued the policy.

Noting materiality is determined under section 334 " 'solely by the probable and reasonable influence of the facts' " on the insurer, plaintiffs nevertheless contend "it plainly is not 'reasonable' for Underwriters to claim that the failure to disclose

33

the Ponzi scheme by which Shapiro defrauded investors with promises of exaggerated financial returns was material to a policy for fire risk and other property damage." Woodbridge Fund 1 and its affiliates were an integral part of the Ponzi scheme—they were the funding arm, using their purported hard money lending businesses to raise funds from those defrauded investors. Moreover, the Riverdale portfolio insured under the policy may have consisted of "real" loans, but it was not free of the Ponzi scheme's taint. The uncontroverted evidence shows the assignments of the Maui property's nonexistent mortgage were used to cheat investors in the Ponzi scheme, Shapiro created Riverdale to act for Woodbridge, and the loans under the Riverdale portfolio were funded—at least in part—with defrauded investor money.

Those facts did not make the insured properties more likely to burn down or suffer damage or loss. But, on this record, the only conclusion a jury could reach is that All Risks reasonably would have rejected Woodbridge Fund 1's application for coverage under its lender program had it learned the primary insured was involved in a scheme to dupe investors out of millions of dollars by selling them interests in purported real estate loans—even if those loans were not part of the portfolio to be insured.

c. *Plaintiffs did not present evidence raising a triable issue of material fact as to materiality*

Plaintiffs argue Underwriters presented no evidence that the Ponzi scheme was material other than "because they said it was." Plaintiffs essentially contend Evans's declaration cannot be believed. They rely on our Supreme Court's statement in *Thompson, supra*, 9 Cal.3d at page 916 that "the trier of fact is

34

not required to believe the 'post mortem' testimony of an insurer's agents that insurance would have been refused had the true fact been disclosed."  Plaintiffs forget the corollary "rule":  the "argument that the trial court need not believe" the insurer's representative's testimony "is insufficient to raise a triable issue of fact."  (*Duarte, supra*, 13 Cal.App.5th at p. 58; see also *Sogomonian*, *supra*, 198 Cal.App.3d at p. 181 [rejecting insureds' "naked argument that since a jury might 'disbelieve' all of the uncontradicted evidence presented by [the insurer], they are entitled to a trial on the question of materiality"].)

Plaintiffs, however, presented no evidence to controvert Evans's declaration that, had All Risks known the primary insured under the policy was a key player in a Ponzi scheme, it would not have offered the policy nor been permitted to underwrite it.[30]  Plaintiffs argue the evidence that another group of underwriters at Lloyd's issued an insurance policy covering the same properties under the same type of program—after the Ponzi scheme became public—shows, or raises a triable issue of material fact as to, the failure to disclose the scheme was not reasonably material to Underwriters' issuance of the policy. We do not agree.

---

[30]     *Atmel Corp. v. St. Paul Fire & Marine Ins. Co.* (N.D. Cal. 2006) 416 F.Supp.2d 802, on which plaintiffs relied, is thus distinguishable.  There, the insured presented evidence raising a genuine issue of fact as to whether problems with its product were material to the insurer by demonstrating the underwriter knew of a lawsuit about those problems but didn't ask the insured about the suit—or its knowledge of the problems— before renewing the policy.  (*Id.* at p. 811.)

The new syndicate of Lloyd's underwriters did not agree to insure properties and mortgage interests held by an entity engaged in active fraud. By the time the new policy issued in late February 2018, the Ponzi scheme was defunct: the Woodbridge entities were in bankruptcy; Shapiro had "no control over the [Woodbridge] [d]ebtors whatsoever" and had been sued by the SEC for securities fraud; and a replacement board had been installed with new management and an appointed CRO, who were focused on returning as much money as possible to creditors rather than furthering a criminal enterprise.

Given this significant change in events, no reasonable juror could find Underwriters similarly would have issued the policy in February 2017 and been unfazed by Woodbridge Fund 1's and its affiliates' criminality. The insured portfolio may have involved only true, third-party loans, but even plaintiffs' own witness Horenberg testified that, considering a Ponzi scheme is "illegal and immoral," he didn't think "insurance carriers would insure that no matter what." Moreover, in February 2017 Shapiro still had sole operational control over the Woodbridge entities, including Woodbridge Fund 1, as well as sole signing authority over the Woodbridge entities' bank accounts.

Plaintiffs also imply that, because Underwriters agreed to insure two Colorado properties that did not qualify for coverage under the policy—they were neither REO properties nor properties requiring lender-placed insurance but new homes under construction—any failure on Woodbridge Fund 1's part to satisfy the parameters of the lender program could not have been material. Again, we disagree.

In August 2016, when Horenberg *asked* All Risks if the Colorado properties could be added to the policy, he fully

36

disclosed they were under construction and not "take back" (REO) properties, and he gave All Risks the names of the affiliated entities that owned them. All Risks was able to get coverage for those properties under the policy as an exception for an additional premium. But an agreement to insure two properties as exceptions to the policy's requirements cannot reasonably lead to an inference that Underwriters equally would have agreed to "except" the primary named insured from being a legitimate lender—the underlying requirement to qualify for the insurance program—or looked past its operation of a fraudulent investment scheme based on sham real estate loans.

Plaintiffs argue Underwriters "are simply trying to wriggle out of paying a large claim—money that would go not to Shapiro or other wrongdoers but to Shapiro's defrauded investors." They urge us to "ensure that those investors are not victimized again, this time by an opportunistic insurance company." We empathize with the investors' plight. There is no dispute, however, that Woodbridge Fund 1 was under Shapiro's control and actively engaged in the Ponzi scheme when it applied in January 2017 to renew the policy.

Our holding does not, as plaintiffs assert, make new law to "allow[ ] an insurer to rescind a policy based on after-discovered misconduct unrelated to the insured risk" or "open[ ] the door for all insurers to rescind all policies they regret issuing." As we discussed, here, the "unfavorable information" was not some uncovered past indiscretion, as in *Olson*, but the primary insured's active and ongoing involvement in a criminal enterprise. The uncontroverted evidence showed: Woodbridge Fund 1 was actively using its hard money lending business in furtherance of a criminal Ponzi scheme when it applied for

37

and renewed the insurance policy; the loans on the properties to be insured were funded by money invested in sham loans; and Woodbridge used the Maui property to cheat investors. On this record, we cannot conclude a trier of fact could find the disclosure of the Ponzi scheme would not reasonably have affected All Risks' or Underwriters' decision to issue the policy.

Accordingly, summary judgment in favor of Underwriters was proper, as was the denial of plaintiffs' motion for summary adjudication as moot.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.